**MID–STATE FERTILIZER CO., an Illinois corporation, Lasley Kimmel, and Maxine Kimmel, Plaintiffs,**

v.

**The EXCHANGE NATIONAL BANK OF CHICAGO, Defendant.**

**No. 87 C 1078.**

United States District Court, N.D. Illinois, E.D.

July 6, 1988.

James W. Wexstten, Mt. Vernon, Ill., Thomas E. Leiter, Leiter, Leiter & Sahn, Peoria, Ill., for plaintiffs.

David L. Piercy, Howard & Howard, Mt. Vernon, Ill., David N. Missner, Franklin S. Schwerin, Angel Rodriquez, Schwartz, Cooper, Kolb & Gaynor, Chicago, Ill., Mark G. Arnold, Dorothy White–Coleman, Husch, Eppenberger, Donohue, Cornfeld & Jenkins, St. Louis, Mo., for defendant.

## MEMORANDUM OPINION AND ORDER

HART, District Judge.

Plaintiffs in this case are Mid–State Fertilizer Company and its two shareholders, Lasley and Maxine Kimmel. The Kimmels are also officers of Mid–State. The defendant is The Exchange National Bank of Chicago.[1] In February 1985, Exchange provided a two-million-dollar line of credit to Mid–State. Repayment of this loan was secured by a security agreement imposing a first lien on all of Mid–State's nonreal property, including accounts receivable, inventory, equipment, general intangibles, and proceeds. The Kimmels also personally guaranteed the loans. Mid–State was required to establish a checking account from which it could pay all its operating expenses. Deposits were made from the credit line to the checking account to the extent of available collateral as determined by borrowing base certificates submitted by Mid–State. Mid–State was also required to establish a lock box account with Exchange. Customers of Mid–State made payments through the lock box. Mid–State could not withdraw money from the lock box. Instead, the funds in that account were applied to Mid–State's outstanding loan balance. The line of credit expired on November 30, 1985, but was renewed that December for another year. In May 1986, though, Exchange began to cut off the line of credit and declared a default on May 19 and 22. At that time Exchange contacted some of Mid–State's customers to ask them to make payments to Exchange.

Plaintiff's amended complaint contains four federal counts and nine pendent state law counts. The parties agree Illinois law controls on the state counts. The thirteen

---

**1.** Two other defendants were dismissed when their motion pursuant to Fed.R.Civ.P. 12(b)(6) was granted.

counts are designated as follows: I—12 U.S.C. § 1971 Tying Arrangement; II—12 U.S.C. § 1972 Tying Arrangement; III—18 U.S.C. § 1961 RICO; IV—18 U.S.C. § 1962 RICO; V—Common Law Fraud; VI—Breach of Fiduciary Duties; VII—Breach of Duty as Agent; VIII & IX—Bad Faith Dealing/Breach of Contract; X—Tortious Interference with and Control of Business; XI, XII & XIII—Defamation. Counts I, III, V, VI, VIII, X, and XI are brought by Mid–State. Counts II, IV, and IX are brought by the Kimmels. Count XII is brought by Lasley Kimmel and Count XIII by Maxine Kimmel. Defendant has moved for summary judgment on all counts.

■ On a motion for summary judgment, the entire record is considered with all reasonable inferences drawn in favor of the nonmovant and all factual disputes resolved in favor of the nonmovant. *Oxman v. WLS–TV*, 846 F.2d 448, 452 (7th Cir. 1988); *Jakubiec v. Cities Service Co.*, 844 F.2d 470, 471 (7th Cir.1988). The burden of establishing a lack of any genuine issue of material fact rests on the movant. *Id.* at 473. The nonmovant, however, must make a showing sufficient to establish an essential element for which it will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In such instances, the movant need not provide affidavits or deposition testimony showing the nonexistence of these essential elements. *Id.* at 324, 106 S.Ct. at 2553. Also, it is not sufficient to show evidence of purportedly disputed facts if those facts are not plausible in light of the entire record. *Collins v. Associated Pathologists, Ltd.*, 844 F.2d 473, 476–77 (7th Cir.1988).

■ Defendant argues plaintiffs have no standing under the Bank Holding Company Act ("BHCA"). Section 1975 of Title 12 provides that any person injured in his business or property by reason of anything forbidden by 12 U.S.C. § 1972 may bring a suit for damages under the BHCA. Standing under the BHCA has been limited to

direct injuries. *See Campbell v. Wells Fargo Bank, N.A.*, 781 F.2d 440 (5th Cir.), cert. denied, 476 U.S. 1159, 106 S.Ct. 2279, 90 L.Ed.2d 721 (1986); *Omega Homes, Inc. v. Citicorp Acceptance Co.*, 656 F.Supp. 393, 403 (W.D.Va.1987). *See also Sundance Land Corp. v. Community First Federal Savings & Loan Association*, 840 F.2d 653, 660 (9th Cir.1988). A stockholder who is injured merely because the value of his investment in a company suffering BHCA violations has dropped does not have standing under the BHCA. *See Campbell, supra; Sundance supra; Costner v. Blount National Bank of Maryville, Tennessee*, 578 F.2d 1192, 1195 (6th Cir.1978). However, where the stockholder was also the guarantor of the loan and therefore a customer of the bank, the stockholder has standing. *Swerdloff v. Miami National Bank*, 584 F.2d 54, 60 (5th Cir.1978); *Continental Illinois National Bank & Trust Co. of Chicago v. Stanley*, 585 F.Supp. 1385, 1388 (N.D.Ill. 1984). Defendant tries to limit *Swerdloff* and *Stanley* to injuries in a plaintiff's capacity as guarantor. It is clear, however, that *Swerdloff* is not so limited. *See id.*, 584 F.2d at 58–60. *Stanley* follows *Swerdloff* and refers principally to the conclusion that guarantors are customers and therefore have standing. Judge Bua concluded that Stanley had standing as a stockholder *and* guarantor. *Stanley*, 585 F.Supp. at 1388. If defendant's analysis was true, Stanley would only have had standing as a guarantor. This court agrees with *Swerdloff* and *Stanley*. The Kimmels were customers of Exchange—to the extent they suffered injury from the tying arrangement, they have standing under the BHCA.

■ Defendant still argues that Mid–State's losses were not caused by the purportedly illegal tying arrangement. To the extent this is true, the Kimmels' losses also would not be tying losses. To support its claim that Mid–State suffered a loss due to the tying arrangement, plaintiffs point only to one paragraph in the affidavit of its financial expert, William Bryan.[2] The

---

**2.** In their brief, plaintiffs did not respond to the argument Mid–State suffered no tying injury.

The affidavit of Bryan is only referred to in plaintiffs' statement of genuine issues. Plain-

paragraph states, "Further, it is my opinion that the handling of the loan arrangement and use of the locked box or blocked account by Exchange National Bank personnel was such that the likely and predictable result was the demise of Mid–State as a going concern." Bryan states he examined the pleadings, depositions, and documents in this case, but he does not recite any of the specific facts or steps in his reasoning that led him to the conclusion stated in paragraph 8 of his affidavit. Plaintiffs therefore have failed to satisfy their burden of showing specific facts in support of an essential element of their cause of action. *See Evers v. General Motors Corp.,* 770 F.2d 984, 986 (11th Cir. 1985); *United States v. Various Slot Machines on Guam,* 658 F.2d 697, 700–01 (9th Cir.1981).

■ Even if plaintiffs have shown they suffered injury, they have not shown a violation of § 1972.

A plaintiff must plead and prove three things to recover under the anti-tying provision of the Bank Holding Company Act, 12 U.S.C. § 1972(1). First, the plaintiff must show that the banking practice in question was unusual in the banking industry. Second, the plaintiff must show an anti-competitive tying arrangement. Third, the plaintiff must demonstrate that the practice benefits the bank.

June 18, 1987 Order at 4 (quoting *Rae v. Union Bank,* 725 F.2d 478, 480 (9th Cir. 1984)). The affidavit of plaintiffs' expert raises a disputed factual issue as to whether the first element was satisfied. Plaintiffs, however, have not shown that they were required to perform all banking business with Exchange. Mid–State was only required to deposit its account receivables with Exchange. Also, the affidavit of Bryan is too conclusory to create a factual dispute as to whether the lock box requirement was an unreasonable means of protecting the loan.

■ An unusual banking practice does not, by itself, establish a § 1972 violation. *Parsons Steel v. First Alabama Bank of Montgomery,* 679 F.2d 242, 245 (11th Cir. 1982), *rev'd on other grounds,* 474 U.S. 518, 106 S.Ct. 768, 88 L.Ed.2d 877 (1986). As a matter of law, requiring business deposits to be deposited in the lending bank is not an improper anticompetitive practice. *See Nesglo, Inc. v. Chase Manhattan Bank, N.A.,* 506 F.Supp. 254, 264 (D.P.R. 1980), *withdrawn as moot,* 562 F.Supp. 1029 (D.P.R.1983). Plaintiffs have not made an adequate showing establishing the second § 1972 element.

Counts I and II are dismissed. Plaintiffs have failed to show either injury or an illegal, anticompetitive tying arrangement.

■ Defendant also argues that plaintiffs have no standing to bring Counts III and IV, the claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq.* Count III alleges Exchange committed § 1962(a) violations upon Mid–State. It is alleged that Exchange fraudulently represented that moneys deposited into the lock box account would be credited to the loan as soon as available. In many instances, however, the funds were not credited until a day or more after they were available. It is further alleged that the mails were used in this scheme. Mid–State allegedly suffered by not having use of the money as soon as it should have and by being forced out of business and into bankruptcy. In Count IV, it is alleged that, as guarantors of the loans, the Kimmels suffered from the same scheme in that they were fraudulently induced into being guarantors and Exchange is seeking to collect the loan from them and suppliers of Mid–State are seeking to collect on guarantees the Kimmels made to the suppliers.

Plaintiffs have failed to respond to defendant's argument that they lack RICO

tiffs could have lost on this point simply because they failed to make the argument. *See National Fidelity Life Insurance Co. v. Karaganis,* 811 F.2d 357, 360 (7th Cir.1987); *Bonds v. Coca-Cola Co.,* 806 F.2d 1324, 1328 (7th Cir.

1986). The merits of the issue, though, are being considered. The court, however, will not comb the record to see if other affidavits or documents show Mid–State suffered injury. *See id.*

standing.[3] On the other hand, defendant has cited only two cases in support of its argument. There are, however, a large number of district court cases, including three from this district, that have reached the RICO standing issue raised as to Mid–State and the courts have come out on both sides of the issue. Although this court is reluctant to make arguments for plaintiffs that they have not made themselves, the existing precedents adequately set out the arguments for both sides. The court will consider the merits of the standing issue.

Section 1964(c) provides a civil remedy for "any person injured in his business or property by reason of a violation of section 1962." This requirement must be satisfied for there to be standing to bring a RICO claim. *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed. 2d 346 (1985); *People v. Life of Mid–America Insurance Co.*, 805 F.2d 763, 764–65 (7th Cir.1986). Plaintiffs have only alleged violations of § 1962(a). Section 1962(a) prohibits receiving income derived from a pattern of racketeering activity and investing any of that income in acquiring an interest in or establishing an enterprise engaged in interstate commerce. Defendant argues an injury by reason of a violation of § 1962(a) requires injury caused by investment in an enterprise, not simply injury caused by the predicate racketeering acts. A majority of the reported cases on this issue have adopted the view argued by defendant. *See P.M.F. Services, Inc. v. Grady*, 681 F.Supp. 549, 555–56 (N.D.Ill. 1988); *Omega Construction Co. v. Altman*, 667 F.Supp. 453, 465 (W.D.Mich. 1987); *Airlines Reporting Corp. v. Barry*, 666 F.Supp. 1311, 1314–15 (D.Minn.1987); *In re Gas Reclamation, Inc. Securities Litigation*, 659 F.Supp. 493, 511 (S.D.N.Y. 1987); *Cincinnati Gas & Electric Co. v. General Electric Co.*, 656 F.Supp. 49, 84 (S.D.Ohio 1986); *Gilbert v. Prudential– Bache Securities, Inc.*, 643 F.Supp. 107,

109–10 (E.D.Pa.1986); *DeMuro v. E.F. Hutton*, 643 F.Supp. 63, 66–67 (S.D.N.Y. 1986); *Eastern Corporate Federal Credit Union v. Peat, Marwick, Mitchell & Co.*, 639 F.Supp. 1532, 1537 (D.Mass.1986); *Heritage Insurance Co. of America v. First National Bank of Cicero*, 629 F.Supp. 1412, 1417 (N.D.Ill.1986); *Econo–Car International, Inc. v. Agency Rent–A–Car, Inc.*, 589 F.Supp. 1368, 1372 (D.Mass.1984). A significant minority has reached the contrary conclusion. *See In re National Mortgage Equity Corp. Mortgage Pool Certificates Securities Litigation*, 682 F.Supp. 1073, 1081–82 (C.D.Cal.1987); *Smith v. MCI Telecommunications Corp.*, 678 F.Supp. 823, 828–29 (D.Kan.1987); *Haroco, Inc. v. American National Bank & Trust Co. of Chicago*, 647 F.Supp. 1026, 1032–33 (N.D.Ill.1986); *Louisiana Power & Light Co. v. United Gas Pipe Line Co.*, 642 F.Supp. 781, 805–07 (E.D.La.1986). *See also Snider v. Loan Star Art Trading Co.*, 659 F.Supp. 1249, 1255–56, *opinion upon reconsideration*, 672 F.Supp. 977 (E.D.Mich.1987), *aff'd by unpublished order*, 838 F.2d 1215 (6th Cir.1988).[4]

It is clear that violations of § 1962(c) only require a causal relationship between the predicate racketeering acts and injury; there is no requirement of injury caused by a pattern of racketeering. *Sedima*, 473 U.S. at 497, 105 S.Ct. at 3285; *Haroco, Inc. v. American National Bank & Trust Co. of Chicago*, 747 F.2d 384, 398 (7th Cir. 1984), *aff'd*, 473 U.S. 606, 105 S.Ct. 3291, 87 L.Ed.2d 437 (1985) (per curiam). *Haroco* was limited to § 1962(c), 747 F.2d at 387, and *Sedima* also involved only a § 1962(c) violation, 473 U.S. at 496, 105 S.Ct. at 3285. But there is broad language in both opinions that indicates injury caused by predicate racketeering acts is sufficient for any type of § 1962 violation. Also, both cases reject the view that there must be a causal relationship between every element of a RICO claim and the injury. *See Sedima*,

---

**3.** Even the statement of genuine issues fails to provide any citations as to whether plaintiffs suffered any RICO damages and as to whether the Kimmels have a cause of action separate from that of Mid–State. *See* Plaintiffs' Statement of Genuine Issues §§ III(D), IV(D), IV(E).

**4.** For the most complete discussions of the arguments on each side of the issue, see *Grady, supra,* and *Smith, supra.*

473 U.S. at 495–97, 105 S.Ct. at 3284–85; *Haroco,* 747 F.2d at 397.[5]

The § 1962(a) cases cited above were, with one exception, decided subsequent to *Sedima.* They distinguish § 1962(a) from § 1962(c) on the grounds that the "essence" of a § 1962(c) violation is the predicate act, *Sedima,* 473 U.S. at 497, 105 S.Ct. at 3285, while the "nature" of a § 1962(c) violation is the use of the illicit gains. *See, e.g., Grady,* 681 F.Supp. at 556. But the nature of a § 1962(c) violation is not just commission of the predicate acts, it is commission of a *pattern* of predicate acts. Still, there is no requirement that the injury be caused by the pattern as compared to being caused by an individual predicate act. *Marshall & Ilsley Trust Co. v. Pate,* 819 F.2d 806, 809–10 (7th Cir.1987). Although each subsection of § 1962 delineates a different type of RICO violation,[6] the essence of each subsection is still the commission of racketeering acts. This court is not concerned with semantical differences between *Sedima*'s use of "essence" and other court's use of the term "nature." The point is that when *Sedima* refers to the essence of a RICO violation, 473 U.S. at 497, 105 S.Ct. at 3285, the predicate offense is what is being referred to, not also the other elements that are necessary to constitute a violation of any subsection of § 1962. Reading *Sedima* otherwise would be inconsistent with its rejection of the requirement of "racketeering injury" and rejection of the requirement of each element of a RICO violation being a cause of injury. It would also be inconsistent with the Seventh Circuit's decision in *Haroco* which this court is also bound to follow.

The minority view is also consistent with the policy of liberally construing RICO to effectuate its remedial purposes. *See Sed-*

*ima,* 473 U.S. at 498, 105 S.Ct. at 3286; *Smith,* 678 F.Supp. at 829. *See also Jones v. Lampe,* 845 F.2d 755, 756–57 (7th Cir. 1988). Contrary to the view expressed in *Grady,* this is a standard rule of statutory analysis, not "treat[ing] civil RICO as though it falls wholly outside the legal principles that normally apply to statutes and their application." 681 F.Supp. at 555. The language of § 1964(c)—"by reason of a violation of section 1962"—does not have to be given a "strained reading," *id.* at 556, to construe it as including injuries caused by predicate acts that are part of a § 1962(a) violation. It can be given a narrow, but still reasonable, reading that produces the result of the majority view. But that should not be done when such a reading would be inconsistent with the holdings of *Sedima* and *Haroco* and inconsistent with the clear rule that RICO is to be broadly construed. It is for Congress, not the courts, to narrow down what may be viewed as an excessively broad statute. *See Sedima,* 473 U.S. at 497–500, 105 S.Ct. at 3285–3287. Additionally, RICO was intended to reach both "legitimate" and "illegitimate" enterprises. *Sedima,* 473 U.S. at 499, 105 S.Ct. at 3286. Following the majority view would effectively protect corporate defendants from liability in most instances since subsections (a) and (b) would have the narrow construction and under subsection (c) a corporation cannot be both the defendant and the required "enterprise." *See Smith,* 678 F.Supp. at 829.

For the reasons given, this court chooses to follow the minority view and holds that a plaintiff can have standing to bring a § 1962(a) claim as long as it has been injured by a predicate act. The plaintiff need not allege or show injury caused by invest-

---

5. See also the recent case of *Liquid Air Corp. v. Rogers,* 834 F.2d 1297 (7th Cir.1987), in which the court only found it necessary to consider § 1962(a) and § 1962(b) violations. *Id.* at 1307. The court, however, still looked to injury caused by the predicate acts, *see id.* at 1304, not injury caused by the investment of income or the acquiring of control over an enterprise. To similar effect, see *Wilcox v. First Interstate Bank of Oregon N.A.,* 815 F.2d 522, 529 (9th Cir.1987). Also, at least one of the cases cited in *Haroco* as implicitly holding injury caused by the predi-

cate acts satisfies § 1964(c) involved § 1962(a) violations. See *Sutliff, Inc. v. Donovan Cos.,* 727 F.2d 648, 653–54 (7th Cir.1984), cited in *Haroco,* 747 F.2d at 397.

6. Section 1962(a) focuses on investment of racketeering income, § 1962(b) on gaining control of an enterprise through racketeering acts, and § 1962(c) on engaging in racketeering acts while participating in the activities of an enterprise. *See Grady,* 681 F.Supp. at 556.

ment of racketeering income. This, though, does not solve all of Mid–State's problems since Mid–State failed to provide any citation to show it actually suffered injury as a result of the allegedly fraudulent acts. But it is uncontested that there were delays in crediting funds from the lock box account to the loan. Final Pretrial Order, Sched. A ¶ 9. Even if no evidence is presented to show the additional interest expense incurred and even if the amount alleged is small ($4,676.99 as stated in Schedule G of the Pretrial Order), it is axiomatic that the delayed crediting results in additional accrual of interest and RICO has no minimum requirement as to damages that need to be shown. Mid–State has standing to bring Count III.

■ The standing of the Kimmels, however, is different. As with Mid–State, they need only show injury caused by the predicate offenses. Unlike Mid–State, they face the problem that they cannot rely on the indirect injury they suffer as a result of their being shareholders and employees of a corporation that suffers direct injury. *Rand v. Anaconda–Ericsson, Inc.,* 794 F.2d 843, 849 (2d Cir.), *cert. denied,* 479 U.S. 987, 107 S.Ct. 579, 93 L.Ed.2d 582 (1986); *Warren v. Manufacturers National Bank of Detroit,* 759 F.2d 542, 544–45 (6th Cir.1985); *Coronet Insurance Co. v. Seyfarth,* 665 F.Supp. 661, 670 (N.D.Ill. 1987). They also cannot have standing as guarantors if they are merely claiming the indirect injury of having to make good on their guarantees after the principal obligor suffered RICO injury. *Continental Illinois National Bank & Trust Co. of Chicago v. Windham,* 668 F.Supp. 578, 585–86 (E.D.Tex.1987); *Grant v. Union Bank,* 629 F.Supp. 570, 573 (D. Utah 1986). It is clear that the Kimmels have no standing as to the guarantees to the suppliers. The guarantee on the credit from Exchange is different. It is not merely a matter of having to make good on a guarantee. It is also alleged that the Kimmels provided the guarantee after being fraudulently induced to do so by Exchange's commission of pred-

icate acts. Their being guarantors of the loan was purportedly a direct result of the RICO violations. They then suffered injury as a result of being guarantors. Even if Exchange did not cause Mid–State to go out of business—or even if it did, since Exchange's actions toward Mid–State standing alone would still be only indirectly related to the Kimmels—the Kimmels would have standing. There can be more than one proximate cause of an injury. Mid–State's going out of business and Exchange's fraudulent inducement of the Kimmels into becoming guarantors would both be proximate causes of the Kimmels' injury.

■ All three plaintiffs have standing under RICO, but defendant also argues that the RICO claims have not been adequately shown. It argues there is inadequate evidence of a pattern and inadequate evidence of a scheme to defraud. The latter argument is considered first.[7]

■ It is uncontested that Exchange promised to immediately credit the loan with deposits into the lock box, but that it did not always do so. The question is whether Exchange intended at the time of contracting to delay applying credits to the loan. Exchange also argues there is inadequate proof of fraud in that the purported misrepresentations have not been shown to be material. As with a number of other issues, plaintiffs failed to respond to this latter argument. As with common law fraud, materiality is an element of RICO mail fraud. *Grantham & Mann, Inc. v. American Safety Products, Inc.,* 831 F.2d 596, 606 (6th Cir.1987); *Dunham v. Independence Bank of Chicago,* 629 F.Supp. 983, 987 & n. 4 (N.D.Ill.1986); *North American Financial Group, Ltd. v. S.M. R. Enterprises, Inc.,* 583 F.Supp. 691, 697–98 (N.D.Ill.1984). A fact is material if, knowing the truth, the plaintiff would have acted differently. *North American,* 583 F.Supp. at 698. Defendant has pointed to evidence that plaintiffs knew of the failure

---

7. Contrary to defendant's reliance on state law, RICO does not require clear and convincing

evidence of fraud. *Rogers,* 834 F.2d at 1302–03.

to immediately credit the loan shortly after such action began. They were unhappy with the situation, but still renewed the loan in December. It was also stated that it "was not that big a problem." Plaintiffs have not disputed these facts or the inference that can be drawn from them either in their brief or in the statement of genuine issues. They must be assumed to be true and it must be inferred that knowledge of the delays would not have affected plaintiffs' conduct. These facts show that any misrepresentation that may have been made was not material.

Plaintiffs have also failed to establish an intent to defraud. They point to documents prepared at the time the loan was negotiated as proof that Exchange intended from the beginning to delay crediting the loans. Two loan summary forms refer to a 1 day float on the loan. Plaintiffs also contend three profitability analyses show Exchange intended to profit on the investment of Mid–State's money. An employee of Exchange explained at his deposition that the references to a 1 day float were mistakes on the loan summary forms. The people in the department that prepared the forms were accustomed to having a float on the form and would insert a 1 day float if no float was specified on the documents they worked from. The profitability analyses have lines for profits on "net demand deposits." An employee of Exchange testified this only referred to profits on the checking account, not a profit on amounts to be credited to the loan. Notations on the document, however, indicate the estimated profit was computed on both.

Even assuming the loan summary form and profitability analyses show Exchange expected to profit from a 1 day float from the lock box deposits, plaintiffs have not established an intent to defraud. Other behavior of Exchange is inconsistent with such a conclusion. Exchange made no at-tempt to hide the delays in crediting and the Kimmels knew of such delays almost from the beginning. Exchange even sent monthly statements showing the delays. Moreover, the damages or profits were (according to the damage claim in the final pretrial order) only $4,677 over more than a year. The line of credit was $2 million and payments amounted to $11 million. The evidence, therefore, does not raise a disputed fact as to the existence of a scheme to defraud. There are no misrepresentations, omissions, or concealments to support such a claim. *See Smith v. Grundy County National Bank*, 635 F.Supp. 1071, 1076 (N.D.Ill.1986). The minimal support shown for the existence of a knowing and intentional misrepresentation does not, in light of the surrounding circumstances, plausibly establish a disputed factual issue as to intent to defraud. *See Collins*, 844 F.2d at 476–77.

Plaintiffs have failed to provide sufficient evidence to support essential elements of their RICO claims.[8] Counts III and IV are dismissed.

▮ The remaining counts are all pendent state law claims. Since all the federal claims are dismissed, the state law claims will also be dismissed. *Maguire v. Marquette University*, 814 F.2d 1213, 1218 (7th Cir.1987).

IT IS THEREFORE ORDERED that:

(1) Defendant The Exchange National Bank of Chicago's motion for summary judgment is granted.

(2) Plaintiffs' motion to strike the affidavit of Walter Macur is denied as moot.

(3) The Clerk of the Court is directed to enter a judgment in favor of defendants and against plaintiffs dismissing this cause of action. Counts I, II, III, and IV of the First Amended Complaint are dismissed with prejudice as to defendant The Exchange National Bank of Chicago. All oth-

---

**8.** It is unnecessary to determine if each delayed credit to the loan account is a separate transaction for purposes of determining if a pattern of racketeering activity has been shown. *See Lampe*, 845 F.2d 755; *Rogers*, 834 F.2d at 1304–05. The loan renewal, even if considered a separate transaction, could not satisfy the separate transactions requirement for a pattern since the delayed crediting problem was known before renewal and therefore the renewal was not a fraudulently induced transaction. Finally, it was not necessary to rely on Walter Macur's affidavit in deciding any issue and therefore the motion to strike his affidavit is moot.

er counts and all counts against defendants Walter Macur and Mark Fecht are dismissed without prejudice.