ASSOCIATES IN ADOLESCENT
PSYCHIATRY, S.C., et al.,
Plaintiffs,

v.

HOME LIFE INSURANCE COMPANY
OF NEW YORK, a New York
corporation, et al., Defendants.

No. 82 C 4706.

United States District Court,
N.D. Illinois, E.D.

July 23, 1990.

**728**

Gregory Friedman, Coffield, Ungaretti, Harris & Slavin, Chicago, Ill, for AAP.

Ernest Irons, Peterson, Ross, Schloerb & Seidel, Chicago, Ill., for Home Life.

Phillip L. Harris, Winston & Strawn, J. Scott Meyers, Williams & Montgomery, Ltd., Chicago, Ill. for Hosp. Trust Nat.

Barbara A. McDonald, Lord, Bissell & Brook, Chicago, Ill., for Robert Canapary and Canapary Financial Corp.

Robert Radasevich, Neal, Gerber, Eisenberg & Lurie, Chicago, Ill., for Pension Actuaries.

James O. Nolan, Clausen, Miller, Gorman, Caffrey & Witous, P.C., Chicago, Ill., for Eric Kranke.

Eugene L. Mahoney, Mahoney & Zdeb, Ltd., Kenneth R. Gaines, Altheimer & Gray, Chicago, Ill., for Levenfeld, Kanter, Baskes, Lippitz and Biederman.

## MEMORANDUM OPINION AND ORDER

NORDBERG, District Judge.

Previously the Court granted summary judgment in favor of defendants and against plaintiffs on plaintiffs' ERISA and securities claims. *Associates in Adolescent Psychiatry, S.C. v. Home Life Ins. Co.,* 729 F.Supp. 1162 (N.D.Ill.1989). The parties have since filed supplemental briefs concerning the defendants' motion for summary judgment on plaintiffs' RICO claims. These motions for summary judgment are now also granted. Because all of plaintiffs' federal claims have fallen, the Court has decided not to exercise pendent jurisdiction over the sole remaining common law claim, which alleges attorney malpractice, pursuant to the Court's discretion under *United Mine Workers v. Gibbs,* 383 U.S. 715, 728, 86 S.Ct. 1130, 1140, 16 L.Ed.2d 218 (1966). The background facts and parties were detailed in the Court's earlier opinion (see 729 F.Supp. at 1165–69) and will not be repeated, except as necessary to understand why the Court grants summary judgment on the RICO claims.

Plaintiffs allege violations of the three substantive provisions of RICO, 18 U.S.C. §§ 1962(a), (b) & (c). They had previously made allegations of conspiracy under § 1962(d), but dismissed them voluntarily at the close of discovery. Plaintiffs now seek to reinstate their conspiracy allegations; they argue that the Court's finding that Home Life used its own funds (rather than plaintiffs') for the HTNB "float" (see 729 F.Supp. at 1169, 1181) evidences a kickback scheme, in violation of 18 U.S.C. § 1954. But reinstatement will not be allowed, because the Court has determined that there are no substantive RICO violations to support a claim of conspiracy.

Each substantive violation of RICO requires plaintiff to prove a "pattern" of racketeering activity, which in turn requires plaintiff to prove the commission of "at least" two predicate acts of racketeering within ten years. 18 U.S.C. §§ 1961(5), 1962(a)-(c); *Management Computer Services, Inc. v. Hawkins, Ash, Baptie & Co.,* 883 F.2d 48, 50 (7th Cir.1989). Predicate

acts are catalogued in § 1961(1). Having considered the evidence most favorably to plaintiffs, and having drawn all reasonable inferences in their favor, the Court concludes that plaintiffs nevertheless could not persuade a reasonable jury that defendants have committed any predicate acts specified in § 1961(1). *Palucki v. Sears, Roebuck & Co.*, 879 F.2d 1568, 1570 (7th Cir. 1989). As there are no genuine disputes of material fact, judgment may be granted pursuant to Fed.R.Civ.P. 56 as a matter of law. *Weihaupt v. American Medical Ass'n*, 874 F.2d 419, 424 (7th Cir.1989).

The core of plaintiffs' theory—supported by a seventy-seven page brief—is that defendants engaged in three (Response Memorandum, at 17) separate but independent schemes: (1) a scheme to avoid regulation by state insurance commissions; (2) a kickback scheme, accomplished by use of the Home Life–HTNB float, in violation of 18 U.S.C. § 1954; and (3) theft or embezzlement of benefit-plan funds, in violation of 18 U.S.C. § 664. These identifiable schemes further intertwined with a "closed-ended scheme" to induce AAP "to purchase Defendants' pension services and products." Response Memorandum, at 18.

■ The allegations concerning the first "scheme" fail as a matter of law. Plaintiffs argue that the Home Life Corporate Plan Trust was established in Rhode Island because most states forbade selling the FA directly to their citizens, and because Rhode Island had no regulations applicable to the GAC (though, as this Court previously found, there is no question that Home Life submitted copies of the GAC to Rhode Island insurance officials, see 729 F.Supp. at 1168, 1173). Response Memorandum, at 18–19. As defendants have noted, there is nothing illegal about taking advantage of favorable state laws to conduct business, even if this means avoiding regulation by certain states; it is no more illegal to set up a trust in Rhode Island to avoid more onerous New York insurance statutes than it is to incorporate in Delaware to avoid more onerous New York corporate statutes. This sort of business planning inheres in federalism.

■ Similarly unavailing is plaintiffs' claim that the float arrangement constituted an unlawful kickback scheme under 18 U.S.C. § 1954. As the Court explained in its previous opinion, the float cost plaintiffs nothing, because their contributions were immediately put out at interest pursuant to the terms of the FA—in fact, Home Life began crediting the contributions with interest before the contribution checks had cleared. 729 F.Supp. at 1181. Due to this fact, the floated funds were in reality Home Life's own, not plaintiffs'. The entire cost of the float was borne directly by Home Life; whether the cost was passed on to the plaintiffs cannot be determined from the record, but even assuming that it was, this assumption is of no more import than an assumption that Home Life factored its other costs of doing business into the fee and interest structures of the FA. The entire transaction was structured to accommodate Home Life's marketing and sale of the FA, particularly its desire to set up an active, rather than a passive, trust (729 F.Supp. at 1181); to label Home Life's payment of an additional fee to HTNB in the form of the float a "kickback" is to ignore the substance of the transaction. Funds are not kicked back when two independent entities agree between themselves as to the payment to be made for services rendered.

Nor were any funds of plaintiffs stolen or embezzled, *contra* plaintiffs' third alleged scheme. The funds transmitted from Home Life to HTNB were in economic reality Home Life's own. The plaintiffs were paid interest on their contributions from the time Home Life received them, as promised by the contract. *Cf.* Kimmel Dep., at 44 (Plaintiff's Supplemental Summary Judgment Ex. I). There was no violation of 18 U.S.C. § 664.

■ This leaves plaintiffs with only mail and wire fraud on which to base their claim that defendants committed predicate acts. To prove a claim of mail or wire fraud, plaintiff must establish by a preponderance of evidence (1) the existence of a scheme to defraud; (2) intent to defraud; and (3) use of the mails or wires to further the scheme.

*United States v. Consentino,* 869 F.2d 301, 308 (7th Cir.), *cert. denied,* —— U.S. ——, 109 S.Ct. 3220, 106 L.Ed.2d 570 (1989); *Mid–State Fertilizer Co. v. Exchange Nat'l Bank,* 693 F.Supp. 666, 673 n. 7 (N.D. Ill.1988), *aff'd,* 877 F.2d 1333, 1337 (7th Cir.1989). Fraud is defined according to the universal principles recognized by state and federal courts. To prove fraud, a plaintiff must show "(1) that the defendants made a false representation of a material past or existing fact; (2) which was known to be false when made; (3) the misrepresentation must have been made intentionally to induce the plaintiff to act; (4) the plaintiff must rely on the misrepresentation and have the right to rely; and (5) the plaintiff must be injured as a result of such reliance." *North American Financial Group, Ltd. v. S.M.R. Enterprises, Inc.,* 583 F.Supp. 691, 697 (N.D.Ill.1984); *accord Dunham v. Independence Bank of Chicago,* 629 F.Supp. 983, 987 (N.D.Ill. 1986). For the reasons stated below, the Court concludes that plaintiff has failed to put forward evidence from which a reasonable jury could conclude that these requirements have been met.

As a preliminary matter, the Court observes that plaintiffs have supported their claims of material misrepresentations and omissions by presenting the affidavit of Marvin J. Schwarz. This affidavit was not presented to the Court in its current state of detail until after the Court granted summary judgment on plaintiffs' securities and ERISA claims. Although lengthy (twenty-four pages), the affidavit is generally composed of conclusionary statements concerning information that Schwarz says he deemed material without giving any explanation of why that information would have been material to his decision to purchase the Home Life products. It is well settled that "conclusional statements in affidavits 'are entitled to little weight in deciding whether to grant' a motion for summary judgment." *Malhotra v. Cotter & Co.,* 885 F.2d 1305, 1309 (7th Cir.1989) (quoting *Products Liability Ins. Agency, Inc. v. Crum & Forster Ins. Cos.,* 682 F.2d 660, 662 (7th Cir.1982)). Having made this observation, the Court turns to the specific allegations contained in Schwarz's affidavit and the plaintiffs' supplemental memorandum in opposition.

■ Perhaps the principle allegation Schwarz now makes is that "Canapary assured [Schwarz] that the funding instruments that he had recommended for AAP's Plans would earn rates of return equal to the best rates of return in the marketplace." Schwarz Aff. ¶ 21. By this allegation, Schwarz explains that the rate of return "would yield investment returns equal to the best mutual funds." *Id.* ¶ 20.

In the Court's view, the foregoing assertions on their face are simply too extreme and confused to have been believed. Reliance must be justifiable. *North American Financial Group,* 583 F.Supp. at 698. The principal and yield in the Home Life FA (not to mention the PSWL, which on its face showed that it was nothing more than a whole life insurance policy, see 729 F.Supp. at 1177) was to be guaranteed—all in return for a one-time contribution charge of 6.75% of each contribution collected (plus a minimum charge of $15 and a collection fee of $1 per contribution). Schwarz Aff. ¶ 19; 729 F.Supp. at 1167. Some mutual funds choose to assess little or no load charges, i.e., sales charges, because they sell their fund shares directly to the public rather than through brokers. Others have a load charge (some in excess of 6.75%) to reimburse brokers and salesmen. Moreover, all mutual funds charge a continuing management fee or service charge each year. They also do not guarantee principal or yield. Schwarz, on the other hand, purchased a debt instrument—similar to a certificate of deposit, but with partial variable interest—that guaranteed his principal and yield for the next 12 months. Though the contribution charge was higher than some mutual fund load charges, there was no continuing service charge or management fee other than the token $15 yearly charge. Plaintiffs have put forward no evidence that there was any contemporaneous financial instrument being offered that guaranteed principal, yield and the best mutual fund rates in exchange for a one-time 6.75% contribution charge. Their allega-

tions are made even more incredible when coupled with Schwarz's additional assertion that the contribution charge was also a fee for "life-time pension and investment advisor services." Schwarz Aff. ¶ 20. This would mean that plaintiffs were to get not only guaranteed principal and yield earning the best mutual fund rates, but also a variety of professional services.

Justifiable reliance aside, a reasonable jury could not find that Schwarz even relied in fact upon such a representation that the FA would earn the best future mutual fund rates. It is undisputed that before Schwarz ever decided to invest in the FA, he was given a copy of the Home Life Flexible Annuity bulletin. See Canapary Defendants' Reply Brief, Ex. A. This disclosed that the future rate to be paid on contributions made in 1977 was 7¾%. Nevertheless, Schwarz proceeded to invest for his own account, net of expenses, more than $80,000 for two FA certificates in that year. *Id.* Exs. C & D. The oral promise that the interest rate would equal the best future mutual fund rate (assuming that it did not do so) could not have affected Schwarz's decision, because the actual guaranteed interest rate was disclosed to him in advance; this was the rate that he in fact relied upon and agreed to. Besides, no one can foretell the future best mutual fund rate. Apart from the impossibility of foretelling the future, the yields of mutual funds usually relate to the risk involved. United States government obligations pay a lower interest rate than low rated corporate bonds. Moreover, the yield fluctuates from day to day.

Nor can Schwarz claim that he thought 7¾% was the best future mutual fund rate because he had been told it would be. All interest rates and yields of publicly held investments are published and in the public domain. Plaintiff cannot say he reasonably relied upon a fraudulent statement when true information was readily available. *See Blount Financial Services, Inc. v. Walter E. Heller and Co.,* 819 F.2d 151, 153 (6th Cir.1987). The same is true for the amounts to be paid in subsequent years; even if Canapary had told Schwarz that the amount to be paid in the future

would always equal the best mutual fund rates, Schwarz could not have relied upon this impossible representation. The actual FA guaranteed rate was always disclosed and accepted prior to the making of any contributions to it.

■ As for Schwarz's claim that he did not realize the contract would not pay capital gains on contributions (Schwarz Aff. ¶ 51), a reasonable jury could not believe this statement. The FA contract says nothing about capital gains, but discusses only the payment of interest. So too with Schwarz's claim that he thought all investment return earned from the contributions would go to the participants; by the very fact that the rate of return was declared and agreed in advance, there was the clearly implied possibility that Home Life's actual investment success would be better than the declared rate, thus accruing to Home Life's benefit. In any event, subjective views do not a contract or fraudulent misrepresentation make.

■ For similar reasons, a reasonable jury could not find several other alleged misstatements or omissions to have been material or relied upon. Again, Schwarz claims that he never would have chosen the FA as a funding vehicle had he known of the Home Life–HTNB float. Schwarz Aff. ¶ 50. He also claims that he was told that both the FA and the PSWL would be invested in separate funds, rather than Home Life's general account, and that they would operate like mutual funds. *Id.* ¶ 19. Because the contributions were instead placed in Home Life's general account, Schwarz complains that they were subject to an undisclosed margin charge, a ratable share of Home Life's income tax, and an investment expense charge, and that they subsidized Home Life's unprofitable lines of health insurance business. *Id.* Aff. ¶ 48. "A fact is material if, knowing the truth, the plaintiff would have acted differently." *Mid–State Fertilizer,* 693 F.Supp. at 673. It cannot be denied that, before Schwarz ever permitted investment in the FA, he knew the exact rate of return he was to get on the contributions. Any of the undis-

closed costs identified above were presumably factored into this rate of return; had the rate been unsatisfactory, the participants were under no obligation to make other than token contributions to the FA. *See* 729 F.Supp. at 1167; Schwarz Aff. ¶ 19. Instead, with full knowledge of the rates to be paid, contributions totaling $683,797.51 were made on behalf of the participants from August 5, 1977, to August 24, 1979. 729 F.Supp. at 1168. Another $270,000 was contributed to the PSWL between 1977 and 1984. *Id.* Schwarz made contributions to the FA on his own behalf of nearly a quarter of a million dollars each year in 1978 and 1979. Canapary Defendants' Reply Brief, Exs. D–L. Given the advance disclosure of the interest rates, the particular expenses that Home Life considered in setting them could not be deemed material; otherwise, plaintiffs might just as plausibly claim that they were entitled to know Home Life's labor costs, office expenses, lease obligations and salary details.

As for the materiality of Home Life's keeping the contributions in a separate fund, the Court notes that the FA contract itself promised the maintenance of no such separate fund. A reasonable jury could not credit Schwarz's claim that a separate fund reasonably mattered to him when he did not protest the contract's failure to provide for it. Besides, the FA contract disclosed that certificate holders were to participate in the company's annual dividend, in the form of the variable interest rate; this in effect disclosed that the funds were deposited to Home Life's general account, for it is to contributions in the general account that mutual insurance companies pay dividends. *See* 729 F.Supp. at 1186.

The foregoing allegations on plaintiffs' part are particularly troubling in light of the fact that the Mercer proposal, rejected in favor of the Canapary proposal, projected a higher rate of return on plan contributions. Schwarz Aff. ¶ 16. The driving motivation of picking the Home Life plan over the Mercer proposal was to allow the beneficiaries to make the maximum tax deductible contributions. 729 F.Supp. at 1166;

Agreed Statement of Uncontested Facts ("UF") ¶¶ 59–63. By claiming now that he intended all along to earn a rate of return equal to the best mutual funds, Schwarz contradicts his previously admitted reasons for rejecting the Mercer proposal, which premised a higher rate of return, but lower permissible tax-favored contributions.

■ Schwarz also makes a number of other allegations regarding alleged misrepresentations and omissions. He claims that Canapary promised the design of a tax-deferred plan, but that the plan, in the opinion of his tax counsel, violated the Internal Revenue Code (though no ruling to this effect has ever been made by the Internal Revenue Service). Schwarz Aff. ¶ 25. Promised services were never delivered, he further alleges. *Id.* ¶ 26. However, Schwarz has presented no evidence from which a reasonable jury could find that Canapary or his associates acted with the intent of defrauding plaintiffs. *See Mid–State Fertilizer*, 693 F.Supp. at 674. Indeed, no plausible allegation of intent has been made. What profit could Canapary have hoped to make by duping clients into setting up pension plans that Canapary knew would not survive IRS scrutiny? And how could Canapary hope to keep contributions coming on the FA and PSWL if he promised ancillary services with no intention of delivering the services he promised? Promises may ultimately have been broken, but that in no way supports the allegation that they were fraudulently made at the time they were made. And plaintiffs have put forward no compelling evidence to explain why Canapary would have done things that were directly contrary to his long-term business interests. " '[I]f the factual context renders [the] claim implausible—if the claim is one that simply makes no economic sense—[the plaintiffs] must come forward with more persuasive evidence to support their claim than would otherwise be necessary.' " *Mid–State Fertilizer*, 877 F.2d at 1339 (quoting *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)). In light of all the pertinent evi-

dence, the Court concludes that a reasonable jury could not find an intent to defraud.

 Finally, Schwarz alleges that Canapary represented his organization as an incorporated entity that was expert in the planning of pension plans, when it was in fact neither a corporation nor expert. *Id.* ¶¶ 13, 40. But his allegations as to Canapary's representation of himself as an "expert" are intolerably ambiguous. For example, Schwarz states that when he first met with Canapary, Canapary said that he "specialized in providing professional consulting services." Schwarz Aff. ¶ 13. Later, Schwarz says that he would not have accepted Canapary's advice had he known Canapary was not an "expert"—whatever that means—in pension planning. *Id.* ¶ 40. But plaintiffs have not established that pension consulting is an area with regulated standards of expertise; as related by Schwarz's affidavit, it would appear that Canapary at most engaged in puffing up his credentials. In any event, Canapary did have a working relationship with both Home Life, which did specialize in designing pension products and pension plans, as well as with a professional actuarial firm. Canapary thus did in fact specialize in pension consulting. As for Schwarz's claim that he would not have dealt with Canapary had he known that QP/PSC were not incorporated, this stands the usual rule on his head. The ordinary rule is that an incorporated entity, with its theoretically limited liability, must disclose the fact of incorporation in its business dealings.

In short, Schwarz pleads a level of ignorance and naivete that is implausible in light of his level of education, age, and previous experience managing AAP's substantial pension investments. It becomes even more implausible in light of the fact that Schwarz was represented by counsel (who he now sues for malpractice) when he adopted the Home Life approach. The Court finds much truth in defendants' argument that this suit was prompted by the buyer's remorse Schwarz felt when interest rates briefly skyrocketed in the late '70s, making the FA a relatively less attractive investment than some mutual funds.

Having examined all of the evidence, the Court concludes that a reasonable jury could not find that defendants engaged in a scheme to defraud. Accordingly, the Court grants summary judgment in favor of defendants and against plaintiffs on the RICO counts. And having granted summary judgment on all of the federal claims, the Court, determining in its discretion pursuant to *Gibbs* not to exercise pendent jurisdiction over the state malpractice claim against the Levenfeld defendants, dismisses that claim without prejudice.