## In re CONTICOMMODITY SERVICES, INC., SECURITIES LITIGATION.

### MDL No. 644.

United States District Court,
N.D. Illinois, E.D.

January 11, 1990.

Orders on Reconsideration Feb. 7, 1990
and Feb. 22, 1990.

See also, 123 F.R.D. 574.

David T. Pritikin and Geraldine M. Alexis, Sidley & Austin, Chicago, Ill., for Conti-Commodity Services, Inc., Continental Grain Co. and certain current or former officers.

Carla Powers Dykes, Chamberlain, Hrdlicka, White, Johnson & Williams, Houston, Tex., Ray G. Rezner and Wendi Sloane Weitman, Barack, Ferrazzano,

Kirschbaum & Perlman and David B. Levine, Levin & Ginsburg, Ltd., Chicago, Ill., for certain customer parties.

Charles W. Boand, Robert F. Forrer and Quinton F. Seamons, Burke, Wilson & McIlvaine, Chicago, Ill., for Arthur Andersen & Co.

Brice A. Tondre, Madden and Strate, P.C., Wheat Ridge, Colo., for Harvey Herberman & Herberman Corp.

Ron L. Futterman, Hartunian, Futterman & Howard, Chtd., Chicago, Ill., for Joe O. Ragan and Owen & Cynthia Frakes.

Randall Marmor and Harvey Herman, Clausen, Miller, Gorman, Caffrey & Witous, P.C., Chicago, Ill., for Reliance Ins. Co.

Bruce M. Rose, Herbert Beigel and Leigh R. Lasky, Beigel & Sandler, Chicago, Ill., for David J. Ragan.

Charles C. Hileman and Clinton A. Stuntebeck, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., and John L. McConn, Jr., McConn & Hardy, Houston, Tex., for Carroll McEntee McGinley, Inc.

Stanley A. Walton, Seyfarth, Shaw, Fairweather & Geraldson, Chicago, Ill., for Prescott, Ball & Turben and J. Luikart.

Kenneth E. Johns, Jr., Vinson & Elkins, Dallas, Tex., and Peter R. Sonderby and Janet L. Reali, Keck, Mahin & Cate, Chicago, Ill., for Merrill Lynch, Pierce, Fenner & Smith, Inc.

Seth Heald, Office of Special Litigation, U.S. Dept. of Justice, Tax Div., Washington, D.C., for U.S.

Sheldon M. Neider, Neider Financial Consultants, and James Motley, Motley Investments Venture No. 4, Houston, Gerald F. Cerce, Accessories Assoc., Inc., N. Providence, R.I., and Donald Davies, Houston Land Investment Corp., and Bryant P. Jensen, Houston, Tex., pro se.

## MEMORANDUM OPINION AND ORDER

HART, District Judge.

This multidistrict litigation is presently before the court on various motions for

summary judgment. Motions have been filed in 13 of the remaining 15 cases.[1] The motions have been fully briefed and the court heard oral argument on the motions on October 27, 1989. This opinion will discuss all the pending motions and will be referred to as the "Summary Judgment Opinion" or "SJO". The discussion in this case is generally organized by parties. A separate order will be issued in each case making reference to the SJO and specifically stating the ruling as to the individual case.

## I. BACKGROUND

This litigation centers around trading activity at the ContiArbitrage–Houston office ("CAH") of ContiCommodity Services, Inc. ("Conti"). Conti is a fully owned subsidiary of Continental Grain Company ("Continental"). David Ragan was a vice president of Conti and the manager of CAH. CAH was open from August 1981 until May 1984. Conti was a futures commission merchant registered with the Commodity Futures Trading Commission ("CFTC"). During the relevant time period, I.C. Hemmings; C.P. Brown; B & H Investment Services, Ltd. ("B & H"); H & B Investment Services, Ltd. ("H & B"); W. Paul Harris; Richard Sanborn; Grayson Whitehurst; Paul Sarpi; SSJ Associates, Inc.; Marc Enright; Floyd Bender; Dorothy Bender; Joe Ragan; Cynthia Frakes; and Owen Frakes maintained accounts at Conti and authorized David Ragan to trade for their accounts.[2]

David Ragan was to conduct arbitrage trading for the customers. Arbitrage trading is the simultaneous purchase and sale of the same or equivalent securities or commodities in different markets or on different exchanges at different prices, in order to profit from the price differences between markets. The arbitrage trading relevant to this case primarily involved playing the cash market against the futures market in United States government securities. Purchase of the cash government securities (treasury bills, bonds, notes) were financed by repurchase agreements ("repos") and reverse repos. A repo is a short term collateralized loan. The seller of the security agrees that, after a negotiated period of time, the seller will repurchase the security from the original buyer for a different price which includes interest. A reverse repo is a purchase/resale agreement whereby a buyer agrees to resell a purchased security to the original seller at a price which also reflects interest. Trading of this type involved a large amount of debt that had to be reflected in the financial statements of Conti and Continental.

Certain customer parties complain that David Ragan acted improperly in that he did not conduct the type of trading promised, made intercustomer trades, made prearranged trades, made block trades, and failed to timely and properly allocate to specific customers the trades he was making. They seek to hold Conti, Continental, and certain officers of Continental and Conti[3] liable on theories of agency, piercing the corporate veil, and personal involvement. Certain customer parties also complain that Continental required Conti to close out accounts in a short period of time resulting in large losses and lost profits. Certain customer parties claim they were damaged in that they had actual losses and interest expenses, lost profits, and lost tax advantages. The Frakes and Joe Ragan claim that Conti did not distribute the entire balances remaining in their accounts when CAH was closed down. The Frakes and Joe Ragan do not accuse David Ragan

---

1. The parties have represented that *Abraira v. ContiCommodity Services, Inc.*, No. 86 C 2100 (N.D.Ill.), and *Landauer v. United States*, H–87–1038 (S.D.Tex.), are close to settlement. They will be dismissed at the next status hearing.

2. These parties are known collectively as the "customer parties." All but the Frakes and Joe Ragan are represented by the same counsel and have been referred to during this litigation as "certain customer parties." Brown, Hemmings, B & H, and H & B are sometimes grouped together as the "Brown & Hemmings parties." Sanborn, Sarpi, Whitehurst, and SSJ are sometimes grouped together as the "Sanborn group."

3. These defendants will be referred to collectively as the "Conti parties." The officers will be referred to as the "Conti individual defendants."

of any wrongdoing. Conti, on the other hand, claims the customer parties conspired with David Ragan to have profitable trades allocated to them and that this resulted in Conti having to reimburse customers who received the loss side of the trades. Conti has also brought suit against David Ragan for the damages he allegedly caused, including to customers not parties to this suit. Ragan has countersued Conti for breach of contract, interference with contractual relations, and other claims.

A number of other parties are also involved in this litigation. Arthur Andersen & Company ("Andersen") audited the books of Continental and Conti. Certain customers claim Andersen is liable to them for failing to reveal to them the improprieties Andersen allegedly found at Conti. Prescott, Ball & Turben, Inc. ("PBT") and its former employee John Luikart allegedly conducted prearranged trades with Conti for which PBT received a certain percentage of profit that was in essence a commission. PBT claims it did not know the trades were for Conti customers, not Conti itself. Certain customers claim PBT is responsible for some of their damages in that some of the prearranged trades were assigned to them. Conti claims PBT improperly conspired with David Ragan and obtained commissions it was not entitled to. After CAH was closed, David Ragan was employed by Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch") and certain customers transferred their accounts there. Improper practices allegedly continued and certain customers also brought suit against Merrill Lynch. Conti purchased a fidelity bond from Reliance Insurance Company ("Reliance") in 1984. Conti has brought suit to collect on the bond based on liabilities it has incurred as a result of trading at CAH. Also joined in this litigation are tax refund suits brought by certain customers and which involve the deductibility of losses claimed from trading at CAH.

In resolving each motion for summary judgment, the entire record is considered with all reasonable inferences drawn in favor of the nonmovant and all factual disputes resolved in favor of the nonmovant. *Mid–State Fertilizer Co. v. Exchange National Bank of Chicago*, 693 F.Supp. 666, 669 (N.D.Ill.1988), *aff'd*, 877 F.2d 1333 (7th Cir.1989). As regards choice of law issues, where the parties have not made any argument as to which state's law applies, it is assumed that the law of the state of the district where the case was filed applies. However, where there is no citation to that state's law, it is further assumed that the state's law is the same as Illinois. Similarly, where no law is cited from other circuits where cases are filed, it will be assumed that the applicable law is the same as that in the Seventh Circuit.

## II. CUSTOMER PARTIES AND CONTI PARTIES

### A. Overview

The Conti parties have moved for summary judgment dismissing all the claims of the customer parties on the ground they have shown no damages. Continental also moves to dismiss all claims on the ground its corporate veil cannot be pierced. Conti individual defendants also move to dismiss all claims on the ground their personal involvement has not been shown. All the Conti parties also argue that certain specific claims cannot be proven. Conti has not moved for summary judgment on any of its claims against the customer parties. The customer parties generally oppose the motions of the Conti parties, but do concede certain claims should be dismissed. The customer parties also move for summary judgment on some of their claims against Conti and move to dismiss some of Conti's claims against them. All the cases involving claims between the customers and Conti parties were brought in Texas except for Conti's suit against the Brown & Hemmings parties and the claims between Conti and the Frakes. The latter are Illinois cases.

The customer parties have conceded that certain of the following claims should be dismissed: (1) 1933 Securities Act; (2) California Securities Act; (3) Implied Covenant of Good Faith; (4) Tortious Interference with Customer Contracts; (5) Commodity Exchange Act § 4d(2); (6) Commodity Ex-

change Act Control Person; (7) Acquiescence in Fraud; and (8) Failure to Control a Subsidiary.

### B. Damages

At the outset of this case, defendants objected to certain customers' complaints on the grounds that Fed.R.Civ.P. 9(b) required that the customers specify which particular trades were improper. Certain customer parties asserted that they would be unable to specify which trades were improper without discovery. Accordingly, the court did not require trade specificity in the pleadings. During the course of discovery the defendants asked certain customer parties to specify which trades were under attack. Certain customer parties again failed to respond and informed the court of their inability to identify which trades were improper. During pretrial proceedings, certain customer parties were informed that they would be required to specify which trades they contended were improper, "bad", or a sham.

Previous orders of this court have required that any party making a claim based on bad or sham trades specifically identify each such trade upon which the claim rests. *See, e.g.,* Orders dated April 27, 1987; October 22, 1987; May 15, 1989; June 8, 1989; August 25, 1989; September 11, 1989. On September 11, 1989, this court dismissed the customer parties' claims to the extent the claims were based on bad or sham trades because the customers had failed to identify such trades. No attempt was made at that time to identify which particular claims that order applied to. The Conti parties argue all claims should be dismissed for failure to identify trades. Certain customer parties again argue the trades cannot be identified.

The claims of the Frakes and Joe Ragan are not based on allegations of bad trades. Their claims, therefore, cannot be dismissed based on failure to identify trades. It is also clear that there is a factual dispute as to whether they suffered any damages. Account statements exist showing that they were entitled to larger distribution than they actually received from their accounts.

■■■ Certain customer parties have failed to identify any claim against the Conti parties that does not involve alleged bad or sham trades. With the exception of a few examples identified by the certain customer parties and trades Conti has identified as bad trades, certain customer parties have not identified specific bad trades. They continue to argue that it is impossible to identify the bad trades and that they can show damages without specifying the bad trades. This court has previously ruled that the customers had to identify bad trades and struck any claims based on bad trades for failure to identify the trades. *See* Order dated September 11, 1989. That ruling shall essentially remain in effect. At trial certain customer parties will not be permitted to prove any damages based on specific trades except for the specific examples already identified by them or Conti. Also, in proving liability and damages at trial, certain customer parties will not be permitted to identify any specific bad trades other than those already identified.

The customer parties will not be precluded from attempting to prove liability and damages by other means. Therefore, they will be permitted to attempt to show that David Ragan and Conti failed to follow the trading program promised and that, if they had, the customers would have avoided an overall loss and instead have made a profit. They have presented evidence to support this theory and therefore a disputed issue of fact exists as to whether damages can be shown. The projection of potential earnings from a properly followed program must be computed to an appropriate date. Alternatively, those customers who sustained overall losses can obtain damages equal to their losses (including commission expenses) to the extent they can prove specific improper practices requiring the rescission of any trading agreement or the reimbursement of losses. To the extent actual injury and causality can be shown, certain customer parties may also obtain damages for tax advantages lost due to specific improper practices. These, plus

nonduplicative damages arising from the few bad trades that have been specifically identified, are the only damages that certain customer parties will be permitted to present at trial. Certain customer parties will not be permitted to obtain any *additional* damages based on damages specifically arising from a late allocation, prearranged trade, intercustomer trade, block trade, premature closing of positions, or the shutdown of Conti except as to those few bad trades that have been specifically identified.

■ It must also be noted that certain allegations, *e.g.* misrepresentations, may involve discrete actions. For example, except to the extent it is proven to be part of a previously existing scheme or conspiracy, a misrepresentation made in 1983 can only cause subsequent injury. If a customer can only show the net loss or lost profits suffered during the entire investment period, the customer cannot assert damages prior to a proven act of wrongdoing.

### C. Liability of Continental

The customers have presented the following evidence in support of their claim that Continental can be liable as an alter ego of Conti: (1) Continental owns substantially all of Conti's stock; (2) Conti's chairman of the board was an executive vice-president of Continental; (3) Conti borrowed only from Continental and Continental provided significant capital infusions; (4) Conti was undercapitalized for short periods during 1982 and 1984 and may presently have funds insufficient to satisfy any judgment that may be entered against it; (5) Continental closed Conti and Conti is presently a nonfunctioning shell with a $35,000,000 reserve; (6) Continental controlled decisions at Conti including reducing positions, shutting down CAH, restricting certain trading practices, and approving capital expenditures over $100,000; (7) Continental and Conti had consolidated financial statements; (8) funds of the two corporations were commingled to a limited degree; (9) Continental guaranteed some of Conti's debts; (10) Continental was involved in the hiring and firing of some Conti employees; and (11) Continental was kept informed of internal matters at Conti.

■ Under Texas and Illinois law, the corporate veil can be pierced where the parent so controls the subsidiary that the subsidiary is a mere instrument or tool and adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice. *Miles v. AT & T,* 703 F.2d 193, 195 (5th Cir.1983); *Van Dorn Co. v. Future Chemical & Oil Corp.,* 753 F.2d 565, 569–70 (7th Cir.1985); *FMC Finance Corp. v. Murphree,* 632 F.2d 413, 422 (5th Cir.1980). The customers have pointed to sufficient evidence of control, undercapitalization, and other factors to prevent the entry of summary judgment. If Conti is ultimately found to be liable, it may be an injustice to permit Continental to order Conti closed down and left with funds insufficient to satisfy liabilities and not have Continental be liable for injuries caused in part by a practice of Conti ordered or approved by Continental.

The customers have generally put in separate counts their various theories for holding Continental liable. Continental argues that these other theories are legally or factually deficient. Most of Continental's other arguments, however, fall to the side in light of there being facts to support piercing the corporate veil. It is therefore unnecessary to consider further whether the other counts should be dismissed. The issue of whether or not Conti was the alter ego of Continental must be tried.

### D. Liability of Conti Individual Defendants

It is argued that there is no evidence of personal involvement by the Conti individual defendants in commission of the alleged improprieties. It is also argued that there is insufficient evidence of intent. The exhibits cited by the customers in response to the summary judgment motions have been examined and sufficient direct or inferential evidence of individual involvement and scienter has been found to require a trial on the issue of individual responsibility. Claims may be pursued against the Conti individual defendants.

### E. RICO [4]

■ The Conti parties initially argued the customers could not identify a "person" distinct from the "enterprise" as required under 18 U.S.C. § 1962(c). *See Liquid Air Corp. v. Rogers,* 834 F.2d 1297, 1306–07 (7th Cir.1987), *cert. denied,* —— U.S. ——, 109 S.Ct. 3241, 106 L.Ed.2d 588 (1989). The customers responded that Conti, Continental, and CAH in combination are the enterprise and that those individual entities and the individual defendants are persons distinct from the enterprise. *See Fustok v. ContiCommodity Services, Inc.,* 618 F.Supp. 1074 (S.D.N.Y.1985). In their reply, the Conti parties concede the validity of the customers' position, but argue it is not the enterprise alleged in the complaints. The case, however, is now before the court on summary judgment. To the extent the pleadings are inconsistent, they can be amended to conform to the evidence. The § 1962(c) claims will not be dismissed for failure to identify an enterprise.

■ The Conti parties also argue the customers have no standing to bring a § 1962(a) RICO claim because there is no showing of injury from the use or investment of racketeering income. Although apparently a minority view, this court has held that § 1962(a) contains no such requirement. *See Mid–State Fertilizer,* 693 F.Supp. at 671–73. The Seventh Circuit, and apparently the Fifth Circuit as well, have not yet decided this issue. *See Mid–State Fertilizer,* 877 F.2d at 1340 n. 1 (Ripple, J., concurring). Subsequent to this court's decision in *Mid–State Fertilizer,* two circuit courts reached the contrary conclusion. *See Rose v. Bartle,* 871 F.2d 331, 357–58 (3d Cir.1989); *Grider v. Texas Oil & Gas Corp.,* 868 F.2d 1147, 1149–51 (10th Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 76, 107 L.Ed.2d 43 (1989). The position taken in *Mid–State Fertilizer,* however, is still found to be more persuasive. The § 1962(a) claims will not be dismissed for lack of standing.

■ Conti and Continental argue they cannot be vicariously liable under RICO.

The scope of such liability is unclear in this circuit. *See D & S Auto Parts, Inc. v. Schwartz,* 838 F.2d 964, 966–68 (7th Cir.), *cert. denied,* 486 U.S. 1061, 108 S.Ct. 2833, 100 L.Ed.2d 933 (1988); *Liquid Air,* 834 F.2d at 1307. A recent case makes clear, though, that *D & S Auto Parts'* exclusion of *respondeat superior* liability can apply only to corporations that are also the RICO enterprise. *Ashland Oil, Inc. v. Arnett,* 875 F.2d 1271, 1281 (7th Cir.1989). As already discussed above, Conti and Continental are not the enterprise for purposes of the § 1962(c) claim. To the extent either of them is still alleged to be the enterprise for a § 1962(a) or (b) claim, those claims can still proceed on a *respondeat superior* theory since there is evidence that at least some of the allegedly improper employee acts were intended to benefit the corporations, not just the employee.

None of the RICO claims are dismissed on their merits.

### F. Statute of Limitations

The Conti parties move for summary judgment on the Commodity Exchange Act, Rule 10b–5, and state law claims of certain customer parties. It is agreed that the applicable period for each of these claims is two years and that the claims were not brought within two years. The customers, however, argue that discovery of the claims did not occur until less than two years before they filed their complaints. On the record presented, whether the complaints were filed within two years of discovery and whether the customers exercised reasonable diligence is a question of fact that cannot be resolved on the motions for summary judgment.

### G. Commodity Exchange Act

■ The customers have brought claims under § 22(a) of the Commodity Exchange Act ("CEA"), 7 U.S.C. § 25(a), which expressly provides a private right of action under the CEA. Continental and the Conti individual defendants argue that stat-

---

**4.** Arguments as to failure to identify trades and lack of personal involvement of the Conti indi-

vidual defendants are sufficiently discussed in §§ II(B) and II(D) *supra.*

ute does not apply to them. Section 22(a)(1) provides that any person (other than specified organizations not involved in this case) who violates the CEA or who willfully aids, abets, counsels, induces, or procures the commission of such a violation shall be liable for actual damages resulting from one or more of four enumerated transactions (*see* § 22(a)(1)(A)-(D)) and caused by the CEA violation. Section 22(a)(2) provides, except as to those circumstances enumerated in § 22(b) and not argued to be applicable here, that this is the exclusive remedy under the CEA. The plain language of this statute makes clear that there is only a private right of action where the damages are caused by one of the transactions enumerated in § 22(a)(1)(A)-(D) and the only reported case on the subject so holds. *Grossman v. Citrus Associates of New York Cotton Exchange, Inc.*, 706 F.Supp. 221, 230–231 (S.D.N.Y.1989). The customers argue "numerous courts" have held to the contrary. They, however, cite no court cases in support of that assertion, only CFTC reparation actions under § 14 of the CEA, 7 U.S.C. § 18. Those cases are not on point. To make a claim under § 22(a), the customers must show damages resulting from one of the transactions enumerated in the statute.

The customers argue that their damages arose from a transaction described in § 22(a)(1)(B) in that Continental and the Conti individual defendants made a "contract of sale of [a] commodity for future delivery." They argue these parties ordered the fiscal year end winddowns and shutdown at Conti. The customers concede, however, that these were not the closing out of futures, but the close out of cash positions. They argue, nevertheless, that the closing of cash positions affected trading in commodity accounts. Although not fully set forth in § IV(A) of their brief, the customers' argument apparently is as follows. The customers made or purchased futures contracts through Conti. The activity of Conti allegedly violated various provisions of the CEA. This alleged scheme involved the sale and purchase of both cash and futures positions. The wind-

downs and shutdown ordered by Continental and the Conti individual defendants are also claimed to be part of this scheme and therefore those defendants aided, abetted, or induced the scheme of Conti which involved the making or sale of futures contracts. Continental and the Conti individual defendants are claimed to be liable as aiders and abetters.

▇ Continental and the Conti individual defendants, however, point to the plain language of subsections (A) through (D) of § 22(a)(1) and argue that "such person" as used in each of those subsections must also be the violator. Since "such person" in this case can only be Conti or David Ragan, it is argued Continental and the Conti individual defendants cannot be liable under § 22(a). Looking solely to § 22(a), this argument appears correct and is fully consistent with the plain language of the statute. *Grossman*, 706 F.Supp. at 230, is in accord with this argument. This argument, however, ignores 7 U.S.C. § 13c(a) which provides:

(a) Any person who commits, or who willfully aids, abets, counsels, commands, induces, or procures the commission of, a violation of any of the provisions of this chapter, or any of the rules, regulations, or orders issued pursuant to this chapter, or who acts in combination or concert with any other person in any such violation, or who willfully causes an act to be done or omitted which if directly performed or omitted by him or another would be a violation of the provisions of this chapter or any of such rules, regulations, or orders may be held responsible for such violation as a principal.

It is this statute which enables an injured party to bring a court suit against an aider, abetter, inducer, combiner, etc. who was not the "such person" under § 22(a)(1)(A)-(D). *See* H.R.Rep. No. 565, 97th Cong., 2d Sess., pt. I, at 104–05, 142, *reprinted in* 1982 U.S.Code Cong. & Admin.News 3953–54, 3991. The customers have claims against Continental and the Conti individual defendants under the CEA.

■ The Conti parties argue the CEA claims based on breach of fiduciary duty should be dismissed. However, to the extent the breach involves misrepresentations, a claim can be made under the CEA. *See United States v. Dial,* 757 F.2d 163, 168 (7th Cir.), *cert. denied,* 474 U.S. 838, 106 S.Ct. 116, 88 L.Ed.2d 95 (1985). *Cf. Disher v. Information Resources, Inc.,* 691 F.Supp. 75, 86 (N.D.Ill.1988), *aff'd,* 873 F.2d 136 (7th Cir.1989). As the Conti parties point out, there may be no real distinction between the claims labeled fiduciary breach claims and those labeled as being fraudulent misrepresentations in violation of the CEA, but the lack of distinctive elements for a claim does not require that one be dismissed.

■ The customers' claim for failure to supervise in violation of CFTC Regulation 166.3 will be dismissed. Claims for violation of CFTC regulations can only be pursued in reparation proceedings under § 14 of the CEA, not in civil actions for damages pursuant to § 22. *Khalid Bin Alwaleed Foundation v. E.F. Hutton & Co.,* 709 F.Supp. 815, 819–20 (N.D.Ill.1989). *Accord Khalid Bin Talal Bin Abdul Azaiz Al Seoud v. E.F. Hutton & Co.,* 720 F.Supp. 671, 676 (N.D.Ill.1989).

### H. Civil Conspiracy

■ The customers have brought common law conspiracy claims against Conti and Continental. Relying primarily on *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), Conti and Continental argue a subsidiary and parent cannot conspire with each other. That decision, however, is limited to the context of antitrust actions. *Ashland Oil,* 875 F.2d at 1281. Texas common law, which governs most of the claims, recognizes conspiracies between parents and subsidiaries. *Metropolitan Life Insurance Co. v. La Mansion Hotels & Resorts, Ltd.,* 762 S.W.2d 646, 652 (Tex. Ct.App.1988). Under Illinois law, an agent cannot conspire with a principal. *Salaymeh v. InterQual, Inc.,* 155 Ill.App.3d 1040, 108 Ill.Dec. 578, 581, 508 N.E.2d 1155, 1158 (1987). As the Conti parties have argued on another issue, though, a subsidiary is not necessarily an agent of its parent. Conti and Continental also argue at length that they are distinct entities. To the extent the customers fail to pierce the corporate veil or hold Continental liable on agency principles, they may still be able to prove a conspiracy between Conti and Continental. *Compare Thomas v. Rohner–Gehrig & Co.,* 582 F.Supp. 669, 673 (N.D. Ill.1984). The civil conspiracy claims will not be dismissed.

### I. Tortious Interference with Contract

■ The customers have dropped any claim that the Conti parties interfered with a contract between the customers and David Ragan. The parties now agree that the contract allegedly interfered with was one between the customers and Conti. Conti argues it cannot be liable for interfering with a contract it is a party to. Continental and the Conti individual defendants argue that, as Conti's parent and officers of Conti or its parent, they were qualifiedly privileged to take the actions they took. Conti, however, can be liable for interfering with the contract to the extent it conspired with Continental and Continental's acts were not privileged. *See Boyles v. Thompson,* 585 S.W.2d 821, 836 (Tex.Civ.App.1979). Whether or not a parent or corporate officers were qualifiedly privileged depends on a variety of factors and the particular circumstances. *Maynard v. Caballero,* 752 S.W.2d 719, 721 (Tex.Ct.App.1988); *Frank Coulson Inc.–Buick v. General Motors Corp.,* 488 F.2d 202, 206 (5th Cir.1974); *Langer v. Becker,* 176 Ill.App.3d 745, 126 Ill.Dec. 203, 206–07, 531 N.E.2d 830, 833–34 (1988), *appeal denied,* 125 Ill.2d 566, 130 Ill.Dec. 481, 537 N.E.2d 810 (1989). This includes questions of good faith and malice. *See Sakowitz, Inc. v. Steck,* 669 S.W.2d 105, 109 (Tex. 1984); *Langer,* 126 Ill.Dec. at 206–07, 531 N.E.2d at 833–34. The question of privilege is not one that can be resolved on summary judgment on this record.[5]

5. If the customers succeed at piercing the corporate veil, then there may be a basis for denying

### J. Inducing Breach of Fiduciary Duty

Relying on a privilege argument the same as that made regarding tortious interference with contract, Continental and the Conti individual defendants move to dismiss the inducing breach of duty claims. As discussed in § II(I), there are factual disputes which preclude summary judgment.

### K. Fraudulent Concealment

Continental argues it had no duty to disclose facts and, even if it did, the requisite intent cannot be shown. There is, however, evidence from which it can be inferred Continental may have intentionally covered up the closing out of positions. Whether or not Continental had a duty to disclose turns on the question of whether Conti was Continental's alter ego or agent. Since the latter cannot be resolved on summary judgment, neither can the former. Summary judgment cannot be granted on the fraudulent concealment claims. It is noted, however, that, to the extent this claim is not proven as part of an overall scheme affecting the customers' trading activity, no claim can be shown since the customers have not identified the closed out positions and therefore cannot prove any damages arising solely from the closing out of positions.

### L. Conversion

Conti argues that the conversion claims against it are governed by Illinois law and that the property allegedly converted was intangible property to which Illinois conversion law does not apply. The customers argue Texas law applies and, even if Illinois law applies, government securities and cash are tangible property.

the interference with contract claim. *See Deauville Corp. v. Federated Department Stores, Inc.,* 756 F.2d 1183, 1196–97 (5th Cir.1985). Piercing the corporate veil, however, remains a contested issue.

6. Whether or not the customers had a property interest and whether that interest is one in tangible property would be governed by the law selected by application of the rules set forth in §§ 244–45 of the Restatement. *See* Restatement § 247 comment i. Those, however, are not the

The Frakes' case was filed in Illinois, as was the Brown & Hemmings counterclaim against Conti. The other customer cases are all filed in Texas. In each case, the law of the forum state, including its choice of law rules, apply. *Klaxon Co. v. Stentor Electric Manufacturing Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Both Illinois and Texas follow the "most significant relationship" test of Restatement (Second) of Conflict of Laws § 145 (1971). *Sommers v. 13300 Brandon Corp.,* 712 F.Supp. 702, 704 (N.D.Ill.1989); *Gutierrez v. Collins,* 583 S.W.2d 312, 319 (Tex.1979). Comment i to § 147 of the Restatement states that on tort questions regarding conversion, the law of the state where the alleged converter dealt with the chattel usually will apply.[6] Prior to the shutdown of CAH, Conti dealt with the customers' accounts in Houston. Therefore, unless the most significant relations test clearly points to another state, Texas law controls on the issue of whether a tort of conversion exists for the conversion of intangible property.

The factors to consider in applying the most significant relationship test are (a) the place where the injury occurred; (b) the place where the conduct causing the injury occurred; (c) the domicile, residence, nationality, place of incorporation, and place of business of the parties; and (d) the place where the relationship centered. *Sommers,* 712 F.Supp. at 704. The relationship between the parties centered in Houston, Texas where CAH was located. The conduct causing the injury was ordered from Conti's and Continental's offices in Illinois and New York, but was executed at CAH in Houston. Conti and Continental are incorporated in Delaware.

type of questions that need to be addressed on the present motion. The only issue raised on summary judgment as regards conversion is whether the applicable state law recognizes the tort of conversion for the property involved in this case. Since it is held that Texas law applies and there is no argument that Texas law does not provide that intangible property can be converted, it is unnecessary to determine the character of the property.

Conti's principal place of business is in Illinois and Continental's in New York. The customer parties reside in various states, with only one residing in Texas and apparently none in Illinois. Where the injury should be considered to have occurred cannot be particularized and is not an important factor in this type of case. *See* Restatement § 145 comment e. The above factors do not override the presumption that Texas, as the place where Conti dealt with the property, should be the source of the applicable law.

Texas law applies to the conversion claims in both the Texas cases and the Illinois cases. Therefore the customers may proceed on claims for conversion of intangible property. Certain customer parties, however, have not identified the positions that were improperly closed out and therefore converted. Their failure to identify bad trades precludes them from further pursuing the conversion claims. The Frakes and Joe Ragan, who claim Conti converted the balances in their accounts, not that Conti improperly closed out their positions, can continue with their conversion claims.

### M. Breach of Fiduciary Duty/Fraud

There is evidence of personal involvement and intent of Evers and Goldschmidt. *See* § II(D) *supra*. These claims will not be dismissed.

### N. Punitive Damages

The Conti parties argue there is insufficient evidence to show wantonness, malice, oppression, or circumstances of oppression. The customers have pointed to sufficient evidence from which such can be inferred. The prayers for punitive damages will not be stricken.

### O. State Securities Act

Except for the California Securities Act claim, which the customers concede should be dismissed, none of the state securities law claims are dismissed.

### P. Florida Anti–Fencing Act

Some of the customers are Florida residents and there is evidence of acts performed in Florida. However, just as certain customer parties cannot show damages from any conversion, *see* § II(L) *supra*, they cannot show damages under the Anti–Fencing Act. All the Florida Anti–Fencing Act claims are dismissed except those brought by the Frakes.

### Q. Texas Deceptive Trade Practices Act

The Conti parties argue Brown and Hemmings are business consumers who are excluded from bringing an action under the Texas Deceptive Trade Practices Act, Tex.Bus. & Com.Code Ann. § 17.01 *et seq.*, because they have assets in excess of 25 million dollars. *See id.* § 17.45(4). The exception the Conti parties rely on, though, was not added to the Act until August 29, 1983. *See* Acts 1983, 68th Leg., p. 4943, ch. 883 §§ 2–3. The Act amending the statute provides: "This act applies only to a contract executed on or after the effective date of this Act. A contract executed before the effective date of this Act is governed by the law in effect when the contract was executed." *Id.* § 4. Brown and Hemmings entered into a contract with Conti prior to August 29, 1983. *See* § II(I) *supra*. The exception for business consumers with assets in excess of 25 million dollars does not apply to Brown's and Hemmings's claims against the Conti parties. *Government Employees Credit Union of San Antonio v. Fuji Photo Film U.S.A., Inc.*, 712 S.W.2d 208, 210–11 (Tex.Ct.App. 1986).

### R. Certain Customer Parties' Motions

Certain customer parties have moved for summary judgment in their favor on some of their claims against Conti. They have also moved to dismiss some of Conti's claims against them. Since there are factual disputes as to the statute of limitations, the customers cannot possibly be entitled to summary judgment on any of their claims. Conti has presented evidence from which it can be inferred that the customers conspired with David Ragan. The evidence

is weak, but not so incredible as to be unbelievable. That evidence is a basis for denying summary judgment on both the customers' claims and Conti's claims. The customers' motions for summary judgment are denied in their entirety.[7]

## III. CUSTOMERS AND ARTHUR ANDERSEN

Two cases, *Hemmings v. Fribourg*, No. H–86–4361 (S.D.Tex.), and *Bender v. Fribourg*, No. H–87–195 (S.D.Tex.), contain claims by certain customer parties against Arthur Andersen & Co. ("Andersen"). Andersen has moved for summary judgment on all claims against it.

### A. Procedural Issues

On June 8, 1989, a status hearing was set for June 15, 1989 to determine page limits for briefs in support of dispositive motions. Andersen's counsel was present on June 15, but did not request an oversized brief. An order dated June 16 set page limits. Andersen was "limited to *one* 15–page brief and *one* 10–page reply." (Emphasis in original). Ignoring this order, Andersen filed two briefs. On July 7, those briefs were stricken and Andersen was permitted to file one 25–page brief. Andersen subsequently filed a 25–page brief containing a significant amount of single-spaced text and footnotes. Andersen also filed a "statement of material facts as to which there is no issue" (apparently pertaining only to the merits of various claims) and an "appendix" containing "uncontestable material facts" (pertaining only to the statute of limitations issue). Supporting exhibits were attached to the appendix even though the court had requested that the exhibits not be filed with the motions. The statement of material facts contains numbered paragraphs as required by Local Rule 12(*l*), but makes reference to no affidavits or other materials. The statement of uncontestable material facts, however, is narrative in form and does not contain numbered paragraphs. It is also argumenta-

tive in form which is contrary to the spirit of Local Rule 12(1) and violates the page limits on briefing in that the principal brief already reached the 25–page limit. Such flaunting of this court's rules and orders is certainly not condoned. Moreover, Rule 12(*l*) provides that a violation of it can be a basis for denying summary judgment. To the extent adequate facts and legal arguments are provided, however, the motion for summary judgment will be considered.

Andersen's arguments as to the merits of the claims against it largely consist of briefly reciting the elements of the claim and then asserting that *none* of the elements can be proven. Thus, the statement of material facts consists entirely of negative statements, mostly stated as legal conclusions not factual statements. For example, ¶ 1 is: "Andersen was not in privity of contract or in any relation substantially equivalent to privity of contract with any plaintiff; nor did Andersen have any relationship of trust and confidence with any plaintiff; nor was Andersen required to report to any plaintiff pursuant to Rule 1.16 issued under the Commodity Exchange Act." In taking this approach, Andersen relies on *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), which holds that the party moving for summary judgment need not provide affidavits or other evidence showing the nonexistence of essential elements and that the party with the burden of proof is the one obliged to show evidence of the essential elements. *Celotex*, however, should not be read to relieve the moving party from making arguments or placing its motion in a factual context. Failure to make an argument is, alone, an adequate basis for denying a motion. *See Gold v. Wolpert*, 876 F.2d 1327, 1333 (7th Cir.1989); *Mid–State Fertilizer*, 693 F.Supp. at 669 n. 2. Additionally, as a prudential matter, a court should not be required to deal with such an unfocused motion. *Cf. Max M. v. New Trier High School District No. 203*, 859 F.2d 1297, 1300 (7th Cir.1988). Moreover, as to some,

---

7. The court did not consider arguments contained in the customers' reply that were not contained in their initial brief.

if not all, counts, it was possibly frivolous for Andersen to claim there was no proof as to *every* element of the count. The customers who had to respond on every element and who had to respond to such an unfocused motion had an unnecessary burden placed on them.

To the extent there are discernible arguments adequately supported by law and fact, Andersen's motion will be considered.[8] Also, since conceded by the customers, the RICO and common law fraud claims are dismissed.

### B. Statute of Limitations

■■■ The parties agree that a two-year limitations period applies to all claims except the Texas Securities Act claim. The parties also agree that the issue in the present case is whether the customers discovered or, in the exercise of reasonable diligence, should have discovered Andersen's alleged wrongdoing. *See Coastal Distributing Co. v. NGK Spark Plug Co.*, 779 F.2d 1033, 1037 (5th Cir.1986); *McCarthy v. Paine Webber, Inc.*, 618 F.Supp. 933, 937 (N.D.Ill.1985).

Andersen's recitation of "uncontestable material facts" recites information regarding Conti's alleged wrongdoing. There is little mention of any knowledge of Andersen's alleged wrongdoing. All that Andersen points to regarding itself is that customers knew Andersen examined Conti. Andersen points to no facts indicating that the customers should have suspected Andersen was involved in any of the alleged wrongdoing. The customers present evidence that discovery in the case against Conti was begun in a timely and diligent manner and that the customers added Andersen as a defendant after they obtained sufficient discovery to bring claims against Andersen that they knew had factual support. Whether the customers diligently pursued an investigation of Andersen's role

and when they had sufficient facts to begin the running of the statute of limitations are fact questions that remain for trial. No counts are dismissed for failure to bring suit against Andersen within the statute of limitations.

### C. Damages

As with the Conti parties, this court dismissed all the customers' claims against Andersen that were based on bad trades. *See* Order dated September 11, 1989. Certain customer parties' claims for damages are limited in the same manner as the claims against Conti were limited. *See* § II(B) *supra*.

### D. Rule 10b–5

Andersen argues the customers' claims under § 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 are inadequate because (1) Andersen had no duty to disclose negative information about Conti to the customers; (2) the customers were not purchasers of securities; and (3) Andersen made no material false representations or omissions to the customers that were relied on by the customers.

■■■ The Seventh Circuit has held that § 10(b) and Rule 10b–5 themselves do not impose a duty to disclose upon accountants. *Latigo Ventures v. Laventhol & Horwath*, 876 F.2d 1322, 1327 (7th Cir.1989); *Barker v. Henderson, Franklin, Starnes & Holt*, 797 F.2d 490, 496–97 (7th Cir.1986). *See also Abell v. Potomac Insurance Co.*, 858 F.2d 1104, 1126 (5th Cir.1988), *cert. denied*, — U.S. ——, 109 S.Ct. 3242, 106 L.Ed.2d 589 (1989) (following *Barker*). Any duty to disclose that is the basis of a Rule 10b–5 claim must exist outside the securities laws. *Barker*, 797 F.2d at 496. The Seventh Circuit has held that, under the common law of Illinois, accountants have no

---

**8.** Except to the extent the statute of limitations argument applies to these claims, the motion for summary judgment is not considered as to the following claims because no adequate argument is made: (a) Commodity Exchange Act; (b) tortious interference with contractual relationships; (c) inducement of breach of fiduciary

duty; (d) civil conspiracy; (e) negligence; (f) negligent misrepresentation; (g) aiding and abetting; and (h) Texas Securities Act. For purposes of consistency, however, the court will apply legal rulings reached in other aspects of this case to these claims.

duty to "blow the whistle" on their clients. *Latigo*, 876 F.2d at 1327.

Since the parties make no argument as to what state's law applies in determining Andersen's common law duty, it is assumed Texas law applies since the two cases containing claims against Andersen are from the Southern District of Texas. The customers point to *Blue Bell v. Peat, Marwick, Mitchell & Co.*, 715 S.W.2d 408 (Tex. Ct.App.1986), as establishing a duty for Andersen. That case, however, only concerns to what extent an accountant can be liable to third parties who rely on accounting reports containing false information. *Blue Bell* does not hold that accountants have a duty to blow the whistle on their clients. Since the customers cite no Texas case regarding the duty of an accountant to blow the whistle, it is assumed Texas law is the same as Illinois law and no such duty exists.

■ The customers also argue that Andersen had a duty to disclose the problems found because they were obliged to correct their previous audit report. On June 10, 1982, Andersen issued a report as to the fiscal year ending March 31, 1982 in which it was reported no "material inadequacies" were found. There is evidence that further investigation produced contrary information and the customers argue Andersen had a duty to correct the earlier report. Whether such a duty was created need not be decided. Paragraphs 158–69 of the customers' statement of additional facts sets forth the information the customers received from persons at Andersen regarding Conti. No evidence is presented by the customers to show that they examined, relied upon, or were misled by any 1982 or 1983 reports of Andersen. Since the customers were not misinformed by the 1982 or 1983 reports, Andersen had no duty to the customers to correct any misinformation in the reports. Even if it had a duty, the customers cannot show they relied on or were misled by any misinformation. Therefore, they can have no Rule 10b–5 claim based on the alleged misinformation. *Latigo*, 876 F.2d at 1325–26.

■ The customers also point to another source of the duty. Since Conti was a futures commission merchant, Andersen was obliged under CFTC regulations to report to Conti any "material inadequacies" found and to promptly forward such information directly to the CFTC if Conti did not. *See* 17 C.F.R. § 1.16(e)(2) (1983). This regulation, it is contended, imposed upon Andersen a duty to blow the whistle on Conti. The customers, however, present no evidence that they examined, relied upon, or were misled by the Forms 1–FR filed with the CFTC nor any other information filed with or disseminated by the CFTC. *See Latigo*, 876 F.2d at 1325–26. Perhaps the contention of the customers is that proper reporting to the CFTC would have resulted in a CFTC enforcement action protecting their interests. There are two problems with such an argument. One is that the customers do not point to evidence supporting such a contention. The other is that such an approach does not involve disclosure or nondisclosure to the customers. *See Schlifke v. Seafirst Corp.*, 866 F.2d 935, 945–46 (7th Cir.1989).

The Exchange Act and Rule 10b–5 claims of the customers against Andersen will be dismissed. It is noted that claims that Andersen aided and abetted Conti's alleged Rule 10b–5 claims are distinct claims, the dismissal of which is not considered.

### E. Other Claims

■ As set forth in § III(A) *supra*, no other argument of Andersen merits consideration. However, the effect on the other claims of the issues otherwise considered regarding Andersen or other parties will not be ignored where the result is obvious. The customers' argument regarding Rule 10b–5 incorporated their argument that a common law duty existed that was a basis for their negligence claims. Since those arguments did not prevail as regards Rule 10b–5, the negligence claims must also fail, as well as the gross negligence and negligent misrepresentation claims. No other claims are dismissed.

**1574**

## IV. CUSTOMERS AND UNITED STATES (TAX CASES)

The tax cases are claims for refunds by the Browns, Hemmings, and Benders (the "taxpayers").[9] The Browns and Hemmings claim refunds for 1984 and the Benders for 1981. The government disallowed certain claimed losses and deductions which the taxpayers appealed to the United States Tax Court. The taxpayers then agreed to drop the Tax Court cases and instead pay part of the taxes and file claims for refunds. After the claims for refund were administratively denied, they timely brought suit in district court. The government moves for summary judgment raising the following grounds: (a) the claims for refund are inadequate; (b) the taxpayers raise issues in their court suits that were not raised in the claims for refund; (c) the taxpayers are not permitted to plead in the alternative; (d) the taxpayers have not shown any legitimate trades supporting any losses or deductions; and (e) any losses sustained by the taxpayers are not yet realized.

■ As regards their claims against Conti and other parties, the taxpayers take the position that the trades were all "bad." As regards the tax suits, they must take the position that they were pursuing a legitimate business or making legitimate investments and therefore must contend the trades were "good." The government argues the taxpayers cannot pursue these two inconsistent positions. That issue, however, need not be decided. Even if the taxpayers can plead in the alternative, in response to a motion for summary judgment they must present evidence to support each alternative pursued. *See generally Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The taxpayers present insufficient evidence to support that they have any legitimate losses or deductions. The only thing that can even be construed as trying to make such a showing are their references to Conti pleadings and the taxpayers' claims for refund. *See* Taxpayers' Response to Govern-

ment's Statement of Undisputed Facts ¶¶ 36, 47–49.

■ A party cannot respond to a motion for summary judgment simply by citing its own pleadings. Fed.R.Civ.P. 56(e); *Petru v. City of Berwyn*, 872 F.2d 1359, 1362 (7th Cir.1989); *Instituto Nacional De Comercializacion Agricola v. Continental Illinois National Bank & Trust Co.*, 858 F.2d 1264, 1271 (7th Cir. 1988). As for the Conti pleadings, they may be admissible against the Conti parties as admissions by a party-opponent, but they are not admissible against the government under that exception. *See* Fed.R. Evid. 801(d)(2). Since the allegations of the complaint are not based on personal knowledge, they cannot be used as evidence in opposition to a motion for summary judgment. *See* Fed.R.Civ.P. 56(e); Fed.R.Evid. 602; *Davis v. City of Chicago*, 841 F.2d 186, 189 (7th Cir.1988). Even if Conti's pleadings could be considered, they would be insufficient. First, they contain nothing concerning the Benders. They also contain nothing specifying losses or interest expenses incurred in 1981 or 1984, the only years involved in the refund suits. Further, while losses are referred to, there are no facts alleged to show the trading was profit-motivated. The pleadings cited are lacking in the specificity required in response to a motion for summary judgment. *See* Fed.R.Civ.P. 56(e); *Davis*, 841 F.2d at 189; *Congregation of the Passion v. Kidder Peabody & Co.*, 800 F.2d 177, 182–83 (7th Cir.1986).

■ The taxpayers also present the Conti parties' response to expert witness interrogatories. The expert's statement must also contain specific facts for it to create a factual dispute preventing summary judgment. *See Mid–State Fertilizer*, 877 F.2d at 1339. Again, there is no mention of the Benders or 1981 losses or interest expenses. There is a summary of account balances as of October 31, 1984, but nothing to show balances at the beginning of 1984 or to identify any balances to specific customers. A $27,000,000 loss is referred to as occurring in April and May

---

**9.** The Landauer case is being settled and there-
fore is not considered. *See* note 1 *supra*.

1984, as well as a net loss of $50,000,000 for calendar year 1984, but that is a total for all customers and other parts of the answer state the Brown and Hemmings group was allocated profitable trades by David Ragan. It is stated that the Brown and Hemmings group still had a substantial deficit in their accounts, but when the losses occurred is not specified and what losses the particular members of the group had is not specified. There is also no discussion of whether Brown and Hemmings were engaged in legitimate profit-motivated trades. The response to expert interrogatories does not contain specific facts necessary to defeat summary judgment.

Since the taxpayers have failed to show they are entitled to any refunds on their claims against the government, the government is entitled to summary judgment dismissing the claims against it.

## V. CONTI & CUSTOMERS v. PBT & LUIKART

### A. Background

Both Conti and certain customer parties (the "nonmovants") have brought suit against PBT. Conti also brought suit against PBT's former vice president, John Luikart. PBT and Luikart (the "movants") moved for summary judgment on all claims against them. The movants concede that they made prearranged trades with David Ragan. The prearranged trades were done in pairs and resulted in essentially equal gains and losses for both PBT and Conti except that PBT always received a slightly larger gain generally equal to about $\frac{1}{64}$ of one percent of the par value of one of the securities. This gain for PBT was in essence a commission charged for engaging in the trade. David Ragan allocated the gains and losses to various customers. PBT denies it knew the trades were for customers. The customers, however, point to testimony of PBT's president and David Ragan indicating PBT had such knowledge. Luikart also denied such knowledge, but it can be inferred that he had knowledge and, on the motion for summary judgment, this

factual dispute must be resolved in the customers' favor.

▮ The nonmovants complain that the movants have failed to provide a statement of uncontested facts as required by Local Rule 12($l$). Rule 12($l$) has not been complied with, but a narrative statement of facts has been provided along with citations to the record. Although this practice is not condoned, the court will nevertheless consider the movant's motions. The more difficult problem with PBT's brief is not the lack of clarity in the presentation of facts, but the lack of clarity in argument. Besides lacking clarity, PBT's motion purports to be one directed at all claims against it yet the only claim addressed is the Rule 10b-5 claim made in each of the relevant cases.[10] It will only be considered whether the nonmovants' Rule 10b-5 claims should be dismissed. Luikart also raises the argument, apparently applicable to all claims against him, that he cannot be personally liable. The evidence, however, is to the contrary. PBT's failure to be clear in arguing that all claims against it should be dismissed imposed upon the nonmovants the unnecessary burden of responding as to all counts, but the nonmovants concentrated more on the Rule 10b-5 claims.

### B. Conti

▮ Movants argue they had no duty to disclose information. That argument, however, does not apply to Conti with whom PBT had a direct relationship and therefore owed a duty. Moreover, PBT issued statements implicitly misrepresenting that the trades with Conti were valid transactions rather than prearranged, nonmarket trades. Also, PBT covered up the fact it was indirectly charging Conti commissions. None of Conti's claims against PBT are dismissed.

### C. Customers

▮ Unlike Conti, the customers had no direct relationship with PBT. PBT owed

---

**10.** It is also noted that the movants fail to identify the particular counts of complaints that they seek to have dismissed. *See* Order dated May 16, 1989.

them no duty to disclose. *See Congregation of the Passion*, 800 F.2d at 183. The customers point to the same misrepresentations that Conti points to. The customers, however, point to no evidence that they knew of, relied upon, or were mislead by the misrepresentations. Therefore, they can have no Rule 10b–5 claim against the movants. *See* § III(D) *supra*. The customers' Rule 10b–5 aiding and abetting claim, however, can continue. Scienter can be inferred from evidence of PBT's knowledge the trades were for customers and from the obviously questionable nature of the trades. Furthermore, this case is distinguishable from *Barker*, 797 F.2d at 497, because here PBT profited from each trade David Ragan made on behalf of the customers.

As regards all the claims of the customers against PBT, the customers' damages are limited in the manner described in § II(B) *supra*.

## VI. CUSTOMERS AND MERRILL LYNCH

### A. Background

After David Ragan left Conti and CAH shut down, the Brown and Hemmings parties transferred their CAH accounts to Merrill Lynch where David Ragan had located. In *Hemmings v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, No. H–86–2280 (S.D.Tex.), these customers claim David Ragan thereafter continued to engage in improprieties in handling their accounts. Prior to the transfer, Conti closed the customers' cash positions while leaving open the corresponding arbitrage futures positions. The customers complain Merrill Lynch failed to inform them the cash positions had been closed. Merrill Lynch moves to dismiss all the claims on the ground the customers cannot show Merrill Lynch caused any damages and also because the customers did not identify bad trades. Alternatively, Merrill Lynch argues two claims should be dismissed on their merits. The customers concede the CEA § 4d(2) claim contained in Count II should be dismissed.

### B. Damages

Merrill Lynch contends the evidence shows that any damages the customers sustained was caused when the customers' accounts were at Conti. The customers, however, present evidence that they had no knowledge certain positions were closed and that Merrill Lynch failed to inform them. At oral argument on the summary judgment motions, Merrill Lynch conceded the customers' accounts decreased approximately $2,000,000 while at Merrill Lynch. The customers present evidence that knowledge of the closing of the cash positions would have enabled them to replace those positions and thereby avoid losses. The customers, therefore, have presented evidence of causation as to at least some of their claimed damages. As regards the failure to identify bad trades, the customers' damages claims are limited to the extent described in § II(B) *supra*.

### C. Texas Deceptive Trade Practices Act

Merrill Lynch argues the claims under the Texas Deceptive Trade Practices Act ("DTPA"), Tex.Bus. & Comm.Code Ann. § 17.01 *et seq.*, should be dismissed because these customers are business consumers with assets of 25 million dollars or more. *See id.* § 17.45(4). Unlike the Conti parties, *see* § II(Q) *supra*, any claim against Merrill Lynch arose after § 17.45(4) and (10) were amended.

Under the DTPA:

"Business consumer" means an individual, partnership, or corporation who seeks or acquires by purchase or lease, any goods or services for commercial or business use. The term does not include this state or a subdivision or agency of this state.

*Id.* § 17.45(10). The DTPA also provides:

"Consumer" means an individual, partnership, corporation, this state, or a subdivision or agency of this state who seeks or acquires by purchase or lease, any goods or services, except that the term does not include a business consumer that has assets of $25 million or more, or that is owned or controlled by a corpo-

ration or entity with assets of $25 million or more.

*Id.* § 17.45(4).

 Merrill Lynch has presented evidence showing that Brown and Hemmings each own assets in excess of 25 million dollars. No evidence to the contrary has been presented by the customers. It is also uncontroverted that they were in a trade or business. Merrill Lynch presents no evidence as to the assets of the partnerships, H & B and B & H, that also bring the DTPA claims against Merrill Lynch. The customers present Hemmings's affidavit which states, "The total combined assets devoted by Claude Brown and me to our trading business were approximately $15 million dollar. We did not devote our entire net worth to this business." Hemmings does not make clear what exactly he means by this statement. In any event, no evidence is presented as to what the assets of H & B and B & H were. Once Merrill Lynch raised the issue, as it has, the burden was on the customers to show the partnerships had assets of less than 25 million dollars. *Eckman v. Centennial Savings Bank,* 32 Tex.S.Ct.J. 46 (1988). Since plaintiffs have failed to satisfy that burden, they have not proved an essential element of their claim.[11]

The DTPA claims of Hemmings and Brown are dismissed because the uncontroverted evidence shows that they have assets of 25 million dollars or more. The DTPA claims of B & H & H & B are dismissed because they have failed to show

they are nonbusiness consumers or business consumers with assets of less than 25 million dollars. Count VII of the complaint against Merrill Lynch is dismissed.

## VII. CONTI AND RELIANCE

Based on liabilities it has paid to customers other than those involved in this litigation, Conti seeks to collect on a fidelity bond it had with Reliance. *ContiCommodity Services, Inc. v. Reliance Insurance Co.,* No. 86 C 4404 (N.D.Ill.). The liability to the customers is based on David Ragan's purported dishonesty. The bond was ordered in February or March 1984.[12] The parties agree, at least for purposes of this motion, that the effective date of the bond was May 7, 1984. Reliance moves for summary judgment on the ground Conti discovered David Ragan's dishonesty no later than May 1 or 2, 1984 and therefore the bond does not cover any claims based on David Ragan's dishonesty.

Reliance points to two provisions of the bond as precluding any liability on its part. One is the "discovery clause." The bond provided that Reliance would indemnify Conti and hold Conti harmless for a "loss sustained by [Conti] at any time but discovered during the Bond Period." A rider (SR 6091) adds the following definition of discovery.

Discovery occurs when the insured becomes aware of facts which would cause a reasonable person to assume that a loss covered by the bond has been or will be incurred even though the exact

---

**11.** If it had been shown that the partnerships themselves had assets of less than $25 million dollars, their DTPA claims would not have been dismissed. Merrill Lynch argues all the assets of the partners should be considered the assets of the partnership. It, however, cites no authority in support of that argument which this court would reject; a partnership can hold assets distinct from what each partner holds. Merrill Lynch also argues the partnerships are owned by entities with assets over 25 million dollars. Section 17.45(4) only refers to ownership by "a corporation or entity with assets of $25 million or more." An individual, such as Brown or Hemmings, is not an "entity." The partnerships are not owned by any entity. Last, Merrill Lynch argues there was no purchase of a good or service. Although the securities purchased are not goods, the customers purchased the ser-

vices of investment advice which are covered by the DTPA. *Nottingham v. General American Communications Corp.,* 811 F.2d 873, 878 (5th Cir.), *cert. denied,* 484 U.S. 854, 108 S.Ct. 158, 98 L.Ed.2d 113 (1987); *FDIC v. Munn,* 804 F.2d 860, 865 (5th Cir.1986).

**12.** The statements of fact submitted by the parties do not refer to this date and the court has not combed the record to find evidence of this date. This date, however, is assumed to be true because counsel for Reliance made such a concession at oral argument on the summary judgment motion. This concession is noted because Reliance's brief makes it appear the decision to order the bond was made close to or after May 1, 1984.

amount or details of loss may not be then known. Notice to the insured of an actual or potential claim by a third party which alleges that the insured is liable under circumstances, which, if true, would create a loss under this bond constitutes such discovery.

Reliance claims the undisputed evidence shows the losses resulting from David Ragan's conduct were discovered no later than May 1 or 2, 1984. The provision relied upon is the "cancellation clause." That clause (§ 11 of the bond) provides:

This bond shall be deemed terminated or canceled as to any Employee—(a) as soon as the Insured shall learn of any dishonest or fraudulent act on the part of such Employee, . . . .

Reliance claims the undisputed evidence shows Conti learned of such acts on the part of David Ragan no later than May 1 or 2, 1984.

Reliance relies heavily on the following deposition testimony of Herbert Evers, Conti's president as of May 1984.

Q. At what point did you form the opinion that [David] Ragan was dishonest?

A. At that time.

Q. On May 1 or May 2 [1984]?

A. Yes. I considered him difficult to deal with before that, but not dishonest.

Conti concedes that as of May 1 and 2, on which dates Evers met with David Ragan, Evers had a "suspicion" David Ragan engaged in speculative trading for speculative accounts at a level not justified by the available equity in the accounts and that David Ragan was covering up. Conti also points to testimony of Evers in which he clarified that he believed as of May 1 and 2 that David Ragan was dishonest in answering Evers's questions, but that he did not yet believe David Ragan had engaged in fraudulent conduct with customers. It was after the May 1 and 2 meeting that Conti began investigating David Ragan's conduct. Reliance also points to evidence that David Ragan informed Evers there were substantial losses in customer accounts and that his estimates of the losses varied.

The evidence also shows David Ragan informed Evers the customers would pay their deficits.

■■■■ On this motion for summary judgment, all reasonable inferences must be drawn, and all disputes resolved, in favor of Conti. Reliance is only entitled to summary judgment if the evidence leads to only one conclusion, that Conti discovered David Ragan's wrongdoing before May 7. The evidence is not conclusive as to the "discovery clause." To show discovery, the evidence must be such that a reasonable person would assume a loss covered by the bond *has been* or *will be incurred.* While the evidence is certainly enough to form a suspicion, as Evers admitted, it was not necessarily enough to assume the customers actually had been defrauded. Under the language of the bond, there is a difference between suspicion and reasonably assuming the wrongdoing had been committed. Whether Conti had enough information to make the reasonable assumption is a question that will be left for the jury. The cases cited by Reliance, *First Security Savings v. Kansas Bankers Surety Co.,* 849 F.2d 345 (8th Cir.1988), and *Royal Trust Bank, N.A. v. National Union Fire Insurance Co. of Pittsburgh,* 788 F.2d 719 (11th Cir.1986), do not require the opposite result. Both of those cases, like the present case, are decided on their own particular facts.

■■■ As regards the cancellation clause, Reliance argues Evers's testimony conclusively shows Conti "learned" of David Ragan's dishonesty by May 1 or 2 and therefore the bond never applied to David Ragan's conduct. Reliance, though, ignores the language in the rider (SR 6035a) which defines dishonest or fraudulent acts. That rider amends the principal form to define covered losses as follows:

(A) Loss resulting from one or more dishonest or fraudulent acts of an Employee, committed anywhere and whether committed alone or in collusion with others, including loss of Property resulting from such acts of an Employee, which Property is held by the Insured for

any purpose or in any capacity and whether so held gratuitously or not and whether or not the insured is liable there-for.

Dishonest or fraudulent acts as used in this Insuring Agreement shall mean only dishonest or fraudulent acts committed by such Employee with the manifest intent:

(a) to cause the Insured to sustain such loss; and

(b) to obtain financial benefit for the Employee or for any other person or organization intended by the Employee to receive such benefit, other than salaries, commissions, fees, bonuses, promotions, awards, profit sharing, pensions or other employee benefits earned in the normal course of employment.

This amendment makes clear that "dishonest or fraudulent act" as used in the cancellation clause means a dishonest or fraudulent act causing a covered loss, not just any dishonest act. Contrary to Reliance's argument, there is nothing in the rider limiting the definition of dishonest or fraudulent acts to covered losses under § (A); instead the language of the rider expressly states "as used in this Insuring Agreement." Evers's belief that David Ragan was dishonest with him did not invoke the cancellation clause; only learning of a dishonest act causing a covered loss could do that. As already discussed, there is a factual dispute as to whether such was learned or discovered on May 1 and 2.

Reliance's motion for summary judgment is denied.

## VIII. CUSTOMERS AND DAVID RAGAN

Certain customer parties have moved for summary judgment on some of their claims against David Ragan in *Hemmings v. Ragan*, No. H–87–1333 (S.D.Tex.). They claim there is incontrovertible evidence that David Ragan used block trades contrary to representations he would do individualized trading. They also claim the evidence conclusively shows allocations of the trades to particular customers were untimely and done in a discriminatory manner. The customers claim they are entitled to summary judgment on (a) breach of fiduciary duty claims in violation of the common law and CEA; (b) common law fraud claims; (c) negligence claims; and (d) gross negligence claims. David Ragan opposes summary judgment on all counts. David Ragan admits trades were done in blocks, but argues that conduct does not constitute a basis for any cause of action. David Ragan claims evidence shows trades were timely and nondiscriminatorily allocated and that any damage to the customers was caused by Conti not him. As with the other cases, certain customer parties' claims for damages are limited in the manner described in § II(B) *supra*.

David Ragan's evidence supporting his claim that both futures and cash trades were timely and nondiscriminatorily allocated has been examined. Factual disputes must be resolved in favor of David Ragan, the nonmovant. Therefore, the only issue that need be addressed is whether the failure to inform the customers that trades were made in blocks can form the basis of granting summary judgment on any of the customers' claims.

■ The customers have not pointed to any evidence that use of block trades was a material fact that would have affected their investment decisions. They also fail to point out how block trades harmed them. A particular type of trade can be part of different types of trading programs; use of block trades does not automatically mean that an individual's requested or particularized program is not being followed. In any event, since reliance has not been shown, the customers are not entitled to summary judgment on the common law or CEA § 4b fraud claims. *See Horn v. Ray E. Friedman & Co.*, 776 F.2d 777, 780 (8th Cir.1985); *First National Monetary Corp. v. Weinberger*, 819 F.2d 1334, 1340 (6th Cir.1987); *Herman v. T & S Commodities, Inc.*, 592 F.Supp. 1406, 1416 (S.D.N.Y. 1984). Reliance is also an element of negligent misrepresentation. *See Brown v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 197 Mont. 1, 640 P.2d 453, 458–59

(1982) (quoting Restatement (Second) of Torts § 552 (1977)). Whether the customers relied on a belief that there would be no block trades is also part of the causation issue on the common law breach of fiduciary duty claim. *See id.* 640 P.2d at 457.

Since the failure to show reliance precludes summary judgment on the claims related to block trading, it is unnecessary to determine if the use of block trades is material as a matter of law nor whether a CEA claim can be brought based on block trading of nonregulated cash trades related to regulated futures trades. Certain customer parties' motions for summary judgment against David Ragan are denied in their entirety.

## IX. CONTI PARTIES AND DAVID RAGAN

In *ContiCommodity Services, Inc. v. Ragan*, No. H–84–4652 (S.D.Tex.), Conti and Continental brought suit against David Ragan and others. David Ragan counterclaimed against Conti and Continental. Counterdefendants have moved to dismiss all the counts of David Ragan's countercomplaint. Although this case was filed in Texas, the parties generally cite only Illinois law. Illinois law will be applied to David Ragan's counterclaims except where a party has cited Texas law. To the extent any claims lack evidence as to Continental's direct involvement, Continental can still be held liable for Conti's actions on other grounds. *See* § II(C) *supra.* None of David Ragan's damages claims are based on bad trades; no claims are dismissed for failure to identify bad trades.

### A. Breach of Contract

In Count I of the countercomplaint, David Ragan claims Conti breached oral promises to provide adequate recordkeeping services, staff, data processing equipment, and technical expertise to insure adequate, timely, and accurate posting of trades to customer accounts. In response

to the summary judgment motion, he refers only to the lack of adequate computer equipment. David Ragan claims he was promised the computer equipment both before he was hired and after he was hired. Counterdefendants argue the written contract between Conti and David Ragan superseded any prior oral promise and that the written contract requires that subsequent amendments be in writing.

■ David Ragan presents adequate evidence of a prior oral agreement. *See* David Ragan Affidavit ¶ 12. He argues the written contract did not supersede this promise because the written contract is not a full and complete contract, but only a contract as to compensation. No authority is cited in support of this argument. This argument is misplaced for two reasons. First, the written contract concerns matters in addition to compensation. Second, the contract expressly states:

> The understanding which is set out in detail below supersedes *any* prior agreements or communications which have taken place between us. This agreement also is intended to supersede *any* oral understanding that has been the subject of our frequent discussions.

(Emphasis added). The contract clearly superseded the prior oral agreement and David Ragan presents no grounds for ignoring that provision.

■ As regards the purported subsequent oral agreement, David Ragan correctly argues that such agreements are enforceable despite the contract's express provision that it can only be modified in writing. *Park v. Dealers Transit, Inc.,* 596 F.2d 203, 205 (7th Cir.1979); *Estate of Kern v. Handelsman,* 115 Ill.App.3d 789, 71 Ill.Dec. 407, 411, 450 N.E.2d 1286, 1290 (1983). The documents purportedly showing the existence of the subsequent agreement, *see* David Ragan's response to Conti's & Continental's Statement of Uncontested Facts ¶ 279,[13] have been examined and no evidence of a clear and definite

---

**13.** David Ragan cites to pages 558–87 of his deposition. Those pages, however, were not included in the exhibits submitted by David Ragan. The pages, though, were found in the

computer diskettes submitted by the certain customer parties. As regards a number of other claims as well, David Ragan's cited material could only be found on the computer diskettes.

agreement has been found. Count I of the countercomplaint will be dismissed.

## B. Interference with Employment Relations

■ David Ragan has presented evidence that, after he left Conti to work at Merrill Lynch, Conti and Continental informed Merrill Lynch employees that David Ragan had been involved in criminal conduct with customer accounts. Counterdefendants do not claim the undisputed facts show David Ragan was engaged in criminal conduct. There is evidence from which it can be inferred that counterdefendants intended to induce David Ragan's firing. David Ragan has also presented evidence to support the claim that the information provided by counterdefendants caused David Ragan's dismissal from Merrill Lynch. David Ragan, however, has not presented specific facts showing counterdefendants caused the loss of any other employment. The citations contained in paragraphs 24 and 25 of David Ragan's statement of additional facts ("SOF") have been examined. No loss of a job opportunity caused by counterdefendants is shown. Moreover, David Ragan's deposition contains only nonadmissible hearsay testimony as to any false information counterdefendants passed on to persons other than Merrill Lynch employees.

Count II of the countercomplaint is dismissed to the extent claims are made based on any employment relationship other than the one with Merrill Lynch.

## C. Interference with Business Relations with Customers

David Ragan points only to his own testimony to support his claim that counterdefendants interfered with his relationship with customers. *See* SOF ¶¶ 22–24. There is no testimony that any customer told David Ragan he or she stopped using David Ragan because of any comments heard. Even if there were, David Ragan presents no nonhearsay testimony showing that counterdefendants provided any false information to the customers. Count III of the countercomplaint will be dismissed.

## D. Fraud and Conspiracy

David Ragan does not point to any evidence that counterdefendants made any representations contrary to any decision that had been made. Since no false representations are shown, Count IV of the countercomplaint will be dismissed.

## E. Slander and Libel

Counterdefendants contend David Ragan cannot show any defamatory statements. The record is to the contrary. *See* § IX(B) *supra.* Count V of the countercomplaint will not be dismissed; however, whether all of the elements of a valid claim can be shown is not clear on this record.

## F. Indemnity and Contribution

■ David Ragan claims counterdefendants should indemnify him for any damages he may owe to the customers. This claim, however, is premature since David Ragan has not yet been found liable in any action. *Pate v. Tellepsen Construction Co.,* 596 S.W.2d 548, 552 (Tex.Civ.App. 1980); *Forty–Eight Insulations, Inc. v. Johns–Manville Products Corp.,* 472 F.Supp. 385, 393 (N.D.Ill.1979). *Moricoli v. P & S Management Co.,* 104 Ill.App.3d 234, 60 Ill.Dec. 4, 432 N.E.2d 903 (1982), is inapposite since in that case the indemnitor was already a party to the suit. Moreover, to the extent Texas and Illinois law are inconsistent, Texas law controls in this case. Count VI of the countercomplaint will be dismissed.

## G. Invasion of Privacy

■ David Ragan has presented sufficient circumstantial evidence to show that counterdefendants took possession of his personal bank records. These documents were used in a suit counterdefendants brought against David Ragan in Kentucky. Counterdefendants, citing *Havoco of America, Ltd. v. Hollobow,* 702 F.2d 643, 647 (7th Cir.1983), argue this makes the claim one for malicious prosecution. David Ragan does not point to use or publication of these documents other than in the Kentucky proceeding. David Ragan has not

shown that the alleged intrusion, not the lawsuit itself, caused him any anguish or suffering. *See Mucklow v. John Marshall Law School,* 176 Ill.App.3d 886, 126 Ill.Dec. 314, 319, 531 N.E.2d 941, 946 (1988) (quoting *Melvin v. Burling,* 141 Ill.App.3d 786, 95 Ill.Dec. 919, 921–22, 490 N.E.2d 1011, 1013–14 (1986)). Count VII of the countercomplaint will be dismissed.

### H. Negligent Misrepresentation

■ David Ragan argues that counterdefendants were in the business of providing information to regulatory bodies such as the CFTC, Chicago Board of Trade, and Internal Revenue Service and that he can bring suit for negligent misrepresentations to such agencies that caused injury to him. No authority is cited in support of this argument. The case law cited by counterdefendants is to the contrary, holding that the misrepresentation must be information the plaintiff, not a third party, is relying on. *See Zahorik v. Smith Barney, Harris Upham & Co.,* 664 F.Supp. 309, 313 (N.D. Ill.1987). *See also* Restatement (Second) of Torts § 552 (1977). Count VIII of the countercomplaint will be dismissed.

### I. Breach of Fiduciary Duty

David Ragan has cited no authority to support his claim Conti owed him a fiduciary duty. Count IX of the countercomplaint will be dismissed.

### X. CONCLUSION

As described above and as set forth in the orders for each particular case, the motions for summary judgment in this multidistrict litigation are granted in part and denied in part. Any motion for reconsideration [14] of the rulings on the summary judgment motions *must* be filed by January 25, 1990.[15] The supporting brief *must* also be filed by that date or the motion will be denied.[16] No supporting brief will exceed 10 pages except that certain customer parties will be allowed up to 15 pages and the Conti parties up to 20 pages. Unless ordered by the court, no response to any motion for reconsideration shall be filed. Neither shall any party file a motion for leave to file a response. A status hearing is set for February 21, 1990 at 1:30 p.m. The parties should be prepared at that time to discuss (a) pending motions for reconsideration; (b) any matters remaining to be resolved by this court; and (c) the preparation of final pretrial orders.

IT IS THEREFORE ORDERED that the "Summary Judgment Opinion" is entered in the record of MDL No. 644. Any motions for reconsideration of this opinion and related orders, with supporting briefs, are to be filed by January 25, 1990. No brief may exceed 10 pages except that certain customer parties are allowed 15 pages and the Conti parties 20 pages. No response to any motion for reconsideration is to be filed absent further order of this court. A status hearing is set for February 21, 1990 at 1:30 p.m.

### ORDER

Arthur Andersen and certain customer parties have moved for reconsideration of certain aspects of this court's January 11, 1990 summary judgment opinion ("SJO").

Andersen's motion is denied in its entirety. All the issues raised are already adequately addressed in the SJO.[1]

---

**14.** This is not to be construed as an invitation to file motions for reconsideration as a matter of course. Any reconsideration motion filed should only be based on what the party perceives to be a clear error of fact or law or a misapplication of today's ruling to particular counts of a complaint.

**15.** It is recognized that, in most if not all cases, Fed.R.Civ.P. 59(e), the time requirements of which are measured from the date of entry of a judgment, will provide a greater length of time for seeking reconsideration. Even if not untimely under Rule 59(e), any motion for reconsideration filed after January 25, 1990 will be deemed waived for failing to meet the schedule set by the court.

**16.** The motion and supporting brief should be filed by the given date. They should not be noticed to be presented on a particular date; they should simply be filed.

**1.** Andersen also claims certain counts against it were purportedly dismissed even though those counts were against other parties not Andersen. The orders, however, are clear that those counts

Certain customer parties claim dismissal of certain of Conti's claims were essentially conceded by Conti in that Conti provided no response to customers' arguments to dismiss those claims. Conti shall file a response, not to exceed four pages, in which it shall expressly state these issues are conceded or point to those portions of its previously filed brief where it responded to these issues.

Certain customer parties also claim the evidence previously submitted shows H & B and B & H do not have assets of $25,000,000 or more. See SJO at 1576–1577 & n. 11. Those documents were previously examined and found to be lacking. However, a new affidavit has been submitted in which Isaac Hemmings states, "At no time did H & B and B & H have assets totalling $25 million dollars." In the context of the affidavit, it is not clear that Hemmings has taken into consideration any possible increase in assets due to profitable trading. Hemmings's statement, though, will be taken as true unless Merrill Lynch can submit contrary financial statements or other nonrefutable evidence that either or both partnerships had $25,000,000 or more of assets at the time their claims accrued. Merrill Lynch shall file a response to this aspect of the motion for reconsideration. The response shall not exceed four pages.

The customers' arguments and cited evidence regarding the claims against Andersen were previously considered and discussed. See SJO at 1572–1573. That aspect of the customers' motion for reconsideration is denied.

IT IS THEREFORE ORDERED that:

(1) Arthur Andersen's motion for reconsideration of memorandum opinion and order is denied.

(2) Customer parties' motion for reconsideration of January 11, 1990 orders is denied in part and taken under advisement in part. Customers' reconsideration motion is denied as regards claims against Arthur Andersen. Conti and Merrill Lynch shall answer customers' reconsideration motion by February 14, 1990. The answers shall not exceed four pages.

## ORDER

The customer parties moved for reconsideration of the summary judgment opinion ("SJO") and related orders dated January 11, 1990. That motion was denied in part and Merrill Lynch and Conti were ordered to respond to certain parts of that motion. That reconsideration motion is now granted in part and the SJO and related orders are amended.

Customers have presented evidence that H & B and B & H have assets of less than $25,000,000. Merrill Lynch does not present any contrary evidence. Merrill Lynch again argues that the assets of the partners should be considered, not just the assets of the partnerships themselves. This argument was previously rejected. See SJO 1576–1577. There is no longer any reason for dismissing the Texas Deceptive Trade Practices Act claims of H & B and B & H. The prior orders are amended to reinstate those claims.

Conti has conceded that certain of its claims should be dismissed. Its claims against the customers for aiding and abetting unjust enrichment, aiding and abetting tortious interference, aiding and abetting conspiracy to breach fiduciary duties, aiding and abetting conspiracy to defraud, aiding and abetting breach of contract, conspiracy to be unjustly enriched, and conspiracy to commit tortious interference are dismissed.[1] The claims against Bender for aiding and abetting David Ragan's violations of the Commodity Exchange Act are dismissed. The customer's motion for reconsideration is otherwise denied.

The charts submitted by the customers and Conti are not consistent as to the particular claims and cases the above ruling applies to. Those parties shall submit an

are dismissed as against the defendants named in them.

1. The claims for aiding and abetting David Ragan's breach of fiduciary duty and for aiding and abetting a fraud are not dismissed.

agreed statement as to the particular counts to be dismissed, making sure to also refer to the correct case name and number.

IT IS THEREFORE ORDERED that certain customer parties' motion for reconsideration of January 11, 1990 orders is granted in part and denied in part. Certain customer parties and Conti shall submit a joint statement as to counts to be dismissed on March 2, 1990.